IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

STUDENTS FOR LIFE USA, etc.,    )
    )
      Plaintiff,    )
    )
v.    ) CIVIL ACTION 14-0157-WS-B
    )
TONY G. WALDROP, etc., et al.,    )
    )
      Defendants.    )

## ORDER

This matter is before the Court on the defendants' motion to dismiss. (Doc. 31). The parties have filed briefs in support of their respective positions, (Docs. 31, 41, 43), and the motion is ripe for resolution. After careful consideration, the Court concludes that the motion is due to be granted in part and denied in part.

## BACKGROUND

According to the amended complaint, (Doc. 29), the plaintiff is a student organization at the University of South Alabama ("the University"). The plaintiff seeks to promote its pro-life message through flyers, signs, peaceful demonstrations and other means. In October 2013 and again in February 2014, the plaintiff sought permission to place a "cemetery of innocents" at various campus locations, including an area between an academic building ("Shelby Hall") and two public roads ("Old Shell Road" and "University Boulevard"). Permission to use such locations was denied by University officials. The plaintiff ultimately utilized an area around the student center ("the Speech Zone") that the University's policy ("the First Policy") identified as the only campus location permitted to be used for student speech. In August 2014, the University allegedly adopted another policy ("the Second Policy"), which expands the locations that

can be used for student speech but which continues to prohibit such speech within the campus perimeter ("the Perimeter"), which includes most areas between the street side of campus buildings and the sidewalks paralleling Old Shell Road and University Boulevard.  (*Id.* at 4, 11, 13-20).

The defendants are the University's president, Tony Waldrop; its vice-president for student affairs, John Smith; its assistant vice-president for student affairs and dean of the plaintiff, Michael Mitchell; and the dean of its college of engineering, John Steadman.  All four are sued in both their official and their individual capacities.  (Doc. 29 at 1).

Count One of the amended complaint alleges that the First and Second Policies violate the plaintiff's First Amendment rights of free speech.  Counts Two and Three allege that the First and Second Policies violate the plaintiff's due process and equal protection rights, respectively.  The amended complaint seeks as relief:  a declaration that the Policies violate the plaintiff's constitutional rights; an injunction against enforcement of the Policies and associated practices; an award of nominal damages; and attorney's fees and costs.  (Doc. 29 at 26-38).

The defendants seek the dismissal of:  (1) all claims regarding the First Policy; (2) all claims against them in their individual capacities; and (3) all as-applied challenges to the Second Policy.  (Doc. 31 at 13).

## DISCUSSION

"There is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment."  *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995).  The Court's review on this motion to dismiss is similarly limited to those arguments the parties have expressly advanced.  *E.g., Jurich v. Compass Marine, Inc.*, 908 F. Supp. 2d 1225, 1228 (S.D. Ala. 2012).  Moreover, "a passing reference to an issue in a brief [is] insufficient to properly raise that issue," *Transamerica Leasing, Inc. v. Institute of London Underwriters*, 430 F.3d 1326,

1331 n.4 (11th Cir. 2005), and the Court will not supply legal or analytical support the parties have declined to offer themselves.

## I. First Policy.

The defendants argue that the plaintiff's challenge to the First Policy is moot and that it violates the Eleventh Amendment.

### A. Mootness.

The defendants argue that the plaintiff's challenge to the First Policy has been mooted by adoption of the Second Policy.  (Doc. 31 at 9-11.)  "[A] case is moot when it no longer presents a live controversy with respect to which the court can give meaningful relief." *Troiano v. Supervisor of Elections*, 382 F.3d 1276, 1282 (11th Cir. 2004) (internal quotes omitted).  If a case is or becomes moot, "dismissal is required because mootness is jurisdictional." *Id*. (internal quotes omitted).  "Whether a case is moot is a question of law …." *Id*.

Mootness may occur when the defendant voluntarily ceases the challenged conduct.  However, "[a] defendant claiming that its voluntary compliance moots a case bears the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." *Doe v. Wooten*, 747 F.3d 1317, 1322 (11th Cir. 2014) (internal quotes omitted).  The defendants here are government actors, but "[t]he Supreme Court has applied this same standard in cases involving government actors." *Id*.

Unlike a private defendant, however, a government actor can raise a "rebuttable presumption that the objectionable behavior will *not* recur." *Troiano*, 382 F.3d at 1283 (emphasis in original).[1]  Thus, "a challenge to a government policy that has been unambiguously terminated will be moot in the absence of

---

[1] *See also Sheely v. MRI Radiology Network, P.A.*, 505 F.3d 1173, 1184 (11th Cir. 2007) (confirming that "private citizens are not entitled to this legal presumption").

some reasonable basis to believe that the policy will be reinstated if the suit is terminated." *Id*. at 1285. To obtain the benefit of the rebuttable presumption, the government defendant bears the "initial burden" to show that the offending policy has been unambiguously terminated. *Doe*, 747 F.3d at 1323.

"In general, the repeal of a challenged statute is one of those events that makes it absolutely clear that the allegedly wrongful behavior … could not reasonably be expected to recur." *Harrell v. Florida Bar*, 608 F.3d 1241, 1265 (11th Cir. 2010) (internal quotes omitted). However, the unambiguous termination of a challenged policy can be established, and the consequent rebuttable presumption arise, "[e]ven short of so weighty a legislative act." *Id*. at 1266. The "repea[l] or amend[ment] [of] a challenged statute or policy [is] often a clear indicator of unambiguous termination." *Doe*, 747 F.3d at 1322.

The defendants have offered no affidavit for the proposition that the First Policy has been repealed or otherwise unambiguously terminated. They have, however, submitted uncontroverted evidence that the First Policy, which appeared in the 2013-2014 student handbook,[2] was replaced by the Second Policy in the 2014-2015 student handbook. (Doc. 29-10; Doc. 31 at 3 n.5 (providing online citation)). The student handbook is a joint publication of the student government association and the University, (Doc. 29-4 at 3), and it contains "the most current information at the time of publication." (*Id*.). Moreover, the Second Policy covers the same issues concerning expressive activity as the First Policy. The plaintiff denies that the Second Policy has been adopted and the First Policy "repealed," (Doc. 41 at 6), but it offers no explanation how, under the circumstances just described, the First Policy could be anything other than terminated. Because it is clear that the Second Policy is now in force, and because it is clear that the First Policy is not, and could not be, simultaneously in force, the Court finds that the First Policy has been unambiguously terminated. Whether it

---

[2] (Doc. 29-4 at 7; Doc. 29-5 at 6).

was terminated by formal repeal (which is unknown) or by supersession (which is obvious) is irrelevant.[3]

Because the defendants have met their initial burden of showing that the First Policy has been unambiguously terminated, the plaintiff's challenge to that policy is moot unless there is "some reasonable basis to believe that the policy will be reinstated if the suit is terminated." *Troiano*, 382 F.3d at 1285. "Mere speculation that the [defendant] will return to its previous ways is no substitute for concrete evidence of secret intentions." *National Advertising Co. v. City of Miami*, 402 F.3d 1329, 1334 (11th Cir. 2005).

"[W]here the circumstances surrounding the cessation suggest that the defendant is attempting to manipulate the court's jurisdiction to insulate a favorable decision from review, [citations omitted], courts will not deem a controversy moot." *Harrell*, 608 F.3d at 1266 (internal quotes omitted). "More generally, the timing and content of a voluntary decision to cease a challenged activity are critical in determining the motive for the cessation and therefore whether there is any reasonable expectation … that the alleged violation will recur." *Id.* (internal quotes omitted). "As for timing, a defendant's cessation before receiving notice of a legal challenge weighs in favor of mootness, [citation omitted], while cessation that occurs late in the game will make a court more skeptical of voluntary changes that have been made." *Id.* (internal quotes omitted). "With respect to content, we look for a well-reasoned justification for

---

[3] "[T]he timing and content of the decision are also relevant in assessing whether the defendant's 'termination' of the challenged conduct is sufficiently 'unambiguous' to warrant application of the *Troiano* presumption …." *Harrell*, 608 F.3d at 1266. "Timing" looks to when the cessation occurred vis-à-vis the plaintiff's legal challenge, while "content" looks for "a well-reasoned justification for the cessation." *Id.* The plaintiff does not ask the Court to consider timing and content in this context, and it appears these circumstances are chiefly, if not exclusively, relevant when there is not, as here, a facially obvious termination of a formal policy. *See, e.g., id.* at 1252, 1267-68 (considering the timing and content of a board's unexplained decision to reverse a committee's determination that the plaintiff's legal advertisement violated bar rules, which might have been only a decision not to enforce the rules against the plaintiff in the particular case).

the cessation as evidence that the ceasing party intends to hold steady in its revised

… course." *Id*.; *accord Rich v. Secretary, Florida Department of Corrections*, 716

F.3d 525, 532 (11th Cir. 2013) ("[W]e look to whether the change in government

policy or conduct appears to be the result of substantial deliberation.") (internal

quotes omitted). In addition, "we ask whether the government has consistently

applied a new policy or adhered to a new course of conduct." *Id*. (internal quotes

omitted). Finally, it may be significant whether the defendant "promised not to

resume the prior practice." *Id*. While "[t]hese factors are not exhaustive," *Doe*,

747 F.3d at 1323, the plaintiff relies on them and no others to establish a

reasonable basis to believe the First Policy will be reinstated if the action is

dismissed. (Doc. 41 at 16-17).

As for timing, the Second Policy was adopted on or about August 8, 2014,

approximately four months after suit was filed and the University's counsel

notified of the suit. (Doc. 22; Doc. 29, ¶ 153). The plaintiff stresses that the First

Policy was in effect when the defendants "receiv[ed] notice of a legal challenge,"

*Harrell*, 608 F.3d at 1266, but it ignores the promptness with which the defendants

responded to that notice by replacing the First Policy with the Second. The

change was not made "late in the game," *id*., but at a time when all that had

occurred in this litigation was extended settlement negotiations (instigated by the

plaintiff contemporaneously with filing the complaint and continued by the

plaintiff throughout) and service of process (which occurred barely three weeks

before the Second Policy was adopted). (Docs. 22, 23). This timing indicates a

genuine effort to resolve the dispute informally and an efficient development of a

comprehensive policy covering a complex subject; it does not suggest a subterfuge

to deprive the Court of jurisdiction so that the defendants can then replace the

Second Policy with the First Policy.

As for content, the plaintiff itself, in its amended complaint, articulates the

defendants' "well-reasoned justification" for replacing the First Policy:

"Defendant Waldrop instructed the Defendants to change and alter the First Policy

6

to comply with constitutional mandates ….” (Doc. 29, ¶ 29).  There is no suggestion here that the defendants replaced the First Policy with the crass motive of gaming the system, obtaining dismissal, and then reverting to old ways; instead, the plaintiff credits the defendants with the honorable motive of upholding the Constitution.[4]

The plaintiff denies that the defendants adopted the Second Policy as a “result of substantial deliberation,” (Doc. 41 at 17), but its own allegations again belie such a contention.  According to the amended complaint, the Second Policy was the result of a “process,” one in which three of the defendants were personally involved.  (Doc. 29, ¶¶ 28, 39, 56).  In addition, the length and detail of the Second Policy, and the multiple changes it makes from the First Policy, reflect that some degree of care attended its creation.  The plaintiff insists the Second Policy “materialized like a bolt out of the blue,” but the case on which it relies for this colorful imagery involved a policy that was unwritten, unannounced and unknown until the day it was enforced against the plaintiffs.  *OSU Student Alliance v. Ray*, 699 F.3d 1053, 1064 (9th Cir. 2012).  Nothing remotely of the sort is in play here.

As for consistency of application, the plaintiff correctly notes that the Second Policy has been in force for only a few months.  But the plaintiff does not explain how this circumstance indicates that the defendants are itching to replace the Second Policy with the First.  All policies have a birthdate, and the mere fact that a policy is new cannot of itself make it reasonable to believe the policy is already targeted for elimination.  There is no evidence the Second Policy has been applied, but there is no evidence that, since August 2014, there has been any occasion to apply it, and certainly no indication that the First Policy has been applied in lieu of the Second.

---

[4] Statements in the pleadings may constitute judicial admissions.  *See, e.g., Nichols v. Barwick*, 792 F.2d 1520, 1523 (11th Cir. 1986); Kenneth W. Graham, Jr. & Michael H. Graham, 30B Federal  Practice & Procedure § 7026 (online ed. 2014).  Admissions or not, the plaintiff’s allegations flatly contradict its contention that there is a reasonable basis to believe the defendants will reinstate the First Policy.

The plaintiff complains that the defendants "have never promised not to resume the First Policy." (Doc. 41 at 17). The defendants state in brief that the University "has no intention of reinstating the First Policy," (Doc. 31 at 11), but the plaintiff scoffs that "[s]tatements by counsel in briefs are not evidence." (Doc. 41 at 16 n.5). True enough, but the Eleventh Circuit, in ruling that a challenge to a sign ordinance was moot, expressly relied on statements by counsel, orally and in brief, denying the defendant's intention to resurrect the old ordinance after it was significantly amended. *Coral Springs Street Systems, Inc. v. City of Sunrise*, 371 F.3d 1320, 1332-33 (11th Cir. 2004). The plaintiff has not explained why such an assurance is less adequate here than it was in *Coral Springs*.

The allegations of the amended complaint once again strengthen the inference that the defendants will not revert to the First Policy. The plaintiff insists that the Second Policy can be changed "only with the prior approval of Defendant Smith and the Defendant Waldrop." (Doc. 29, ¶ 37). The plaintiff does not explain why Waldrop and Smith – who ordered that the First Policy be brought into compliance with the Constitution, (*id*., ¶¶ 29, 40) – can reasonably be expected to approve the reinstatement of the allegedly unconstitutional First Policy.

The plaintiff cites four cases as support for the proposition that there is a reasonable basis to believe the defendants will reinstate the First Policy if its legal challenge is ruled moot. (Doc. 41 at 16-17 & 16 n.6). The plaintiff finds *Rich* significant because the change occurred after suit was filed. The defendant in *Rich*, however, waited over two years after suit was filed and did not act until it was also sued by the Department of Justice and until just before appellate argument – timing that clearly qualifies as "late in the game." 716 F.3d at 532. The plaintiff relies on *National Association of Boards of Pharmacy v. Board of Regents*, 633 F.3d 1297 (11th Cir. 2011), as showing a lack of substantial deliberation, but in that case there was no written policy and no justification offered for the change, just an unexplained verbal decision to cancel a board

review course. *Id*. at 1312. The plaintiff cites *Jager v. Douglas County School District*, 862 F.2d 824 (11th Cir. 1989), as rejecting mootness when the change was made under imminent threat of a lawsuit, but the focus of the *Jager* Court's mootness analysis was not timing but rather the defendants' failure to formalize the change as policy (instead leaving implementation of the change up to individual principals), plus their failure to promise not to engage in the former practice (as the absence of a formal policy threatened), plus their continued insistence on appeal that the former practice should be declared constitutional. *Id*. at 833-34. The plaintiff cites *Rich* a second time, for the defendant's failure to promise not to resume its prior practice – a circumstance that, as noted previously, is not presented here. Moreover, unlike here, the defendant in *Rich* also changed course "late in the game" and continued to insist on appeal that its prior conduct be ruled constitutional. 716 F.3d at 532. Finally, the plaintiff compares the newness of the Second Policy with *Jews for Jesus, Inc. v. Hillsborough County Aviation Authority*, 162 F.3d 627 (11th Cir. 1998), where the Court noted that the evidence suggested the new policy had been consistently applied for three years. *Id*. at 629. The Eleventh Circuit, however, did not indicate that the new policy must be applied consistently for any particular length of time (or at all) as a predicate to a finding of mootness.

The Court has studied all the Eleventh Circuit cases cited by the parties and many more besides. None involves a fact pattern supporting the conclusion that the circumstances of this case could, much less must, establish a reasonable basis for believing the defendants will reinstate the First Policy if the instant challenge is declared moot. For the reasons set forth above, the Court finds no reasonable basis to believe the defendants will do so.

The plaintiff argues that its challenge to the First Policy is not moot because it is capable of repetition yet evading review. (Doc. 41 at 8). However, "[a] holding that there is no reasonable expectation that the conduct will recur also

precludes application of the 'capable of repetition, yet evading review' doctrine." *Jews for Jesus*, 162 F.3d at 629 n.4.

The defendants argue that "all claims relating to the First Policy" are due to be dismissed as moot.  (Doc. 31 at 9).  Elsewhere, however, they identify only the requests for declaratory and injunctive relief as moot.  (*Id*. at 11).  The plaintiff concedes that mootness would eliminate its requests for equitable relief in connection with the First Policy, but it argues that its request for damages for violations of its constitutional rights visited by the First Policy is not moot.  (Doc. 41 at 16 n.4, 17).  The plaintiff is correct.  "Because [the plaintiff] has requested damages, however, the changes made to the ordinance do not make this case moot."  *Granite State Outdoor Advertising, Inc., v. City of Clearwater,* 351 F.3d 1112, 1119 (11ᵗʰ Cir. 2003); *accord KH Outdoor, L.L.C. v. Clay County*, 482 F.3d 1299, 1303 (11ᵗʰ Cir. 2007).

### B.  Eleventh Amendment.

The defendants claim the protection of the Eleventh Amendment with respect to all claims against them for declaratory and injunctive relief in their official capacities related to the First Policy.  They acknowledge that the Eleventh Amendment "does not generally prohibit suits seeking only prospective injunctive or declaratory relief," *Summit Medical Associates, P.C. v. Pryor*, 180 F.3d 1326, 1337 (11ᵗʰ Cir. 1999), but they note that it does prohibit declarations that past conduct violated the plaintiff's rights.  The defendants assert that the amended complaint as to the First Policy seeks equitable relief only as to historical wrongs and that this is barred by the Eleventh Amendment.  (Doc. 31 at 4-5).[5]

The plaintiff responds that it is also seeking prospective declaratory and injunctive relief with regard to the First Policy.  (Doc. 41 at 5).  The amended

---

[5] Neither the defendants nor the plaintiff addresses whether federal suits against the University are subject to the Eleventh Amendment; the Court assumes for argument that they are.

complaint, which asks for a declaration that the defendants "are violating [The plaintiff' constitutional rights] under the First Policy" and for "an injunction against Defendants' First Policy," (Doc. 29, ¶¶ 250, 265, 291) confirms the plaintiff's position.  The prayer for relief, which requests a declaration that the "First Policy violates Plaintiff's rights" and an injunction against "enforcing the First Policy and associated practices," (*id*. at 37-38, ¶¶ (A), (B), (E)), does so as well.  The defendants' unexplained assertion that the amended complaint does not seek prospective relief as to the First Policy is not well taken.  The Eleventh Amendment precludes the plaintiff from obtaining retrospective declaratory or injunctive relief, but it does not bar the plaintiff' explicit request for prospective declaratory and injunctive relief as to the First Policy.

In their reply brief, the defendants argue that, even though the amended complaint does seek prospective relief, it does not allege "any ongoing or live harm for which prospective relief is needed from the First Policy."  (Doc. 43 at 2-3).  This is a new argument, not asserted in the defendants' principal brief.[6] "District courts, including this one, ordinarily do not consider arguments raised for the first time on reply."  *Gross-Jones v. Mercy Medical*, 874 F. Supp. 2d 1319, 1330 n.8 (S.D. Ala. 2012) (citing cases and explaining the underlying rationale).  The defendants identify no reason to depart from this well-established rule, and the Court declines to do so.

---

[6] The argument in the defendants' principal brief was that the amended complaint does not seek prospective relief – an issue that implicates the Eleventh Amendment and in support of which the defendants cited only those paragraphs of the amended complaint that articulate the plaintiff's requested relief.  (Doc. 31 at 5).  The argument in the defendants' reply brief is that there is no factual basis in the amended complaint for an award of prospective relief – an issue that does not implicate the Eleventh Amendment and which was not fairly raised or even hinted at in their principal brief.

## II.  Nominal Damages.

The plaintiff seeks an award of nominal damages against each of the defendants in their individual capacities.  (Doc. 29, ¶¶  248, 263, 289).  The defendants argue that the state of Alabama is the real party in interest and that they are protected by qualified immunity.

### A.  Real Party in Interest.

"The Eleventh Amendment bars a suit against state officials when the state is the real, substantial party in interest."  *Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 101 (1984) (internal quotes omitted).  In determining whether the state is the real party in interest, "[t]he general rule is that a suit is against the sovereign if the judgment sought would expend itself on the public treasury or domain … or if the effect of the judgment would be to restrain the Government from acting, or to compel it to act."  *Harbert International, Inc. v. James*, 157 F.3d 1271, 1277 n.3 (11th Cir. 1998) (internal quotes omitted).  The defendants, quoting *Pennhurst* and *Harbert* for these propositions, assert that the state is the real party in interest because the amended complaint does not allege that they violated policy but only that they developed and enforced policy.  (Doc. 31 at 5-7).

The defendants' argument is something of a non sequitur, since it does not address what they concede are the determinative questions:  (1) whether the judgment (if damages) would be paid by the state, and (2) whether the judgment (if injunctive) would require the state to do or not do something.  Because the defendants challenge only the demand for damages, the second question is not on the table.[7]  The first question asks whether "the judgment *must*, under all

_____

[7] In their reply brief, the defendants reference the amended complaint's request for declaratory and injunctive relief, and they insist that "[t]his fits squarely into the rule" expressed in *Harbert*.  (Doc. 43 at 7).  And so it does, but the issue, as framed by the defendants, is limited to an attack on the plaintiff's "individual capacity claims for

circumstances, be paid out of state funds." *Jackson v. Georgia Department of Transportation*, 16 F.3d 1575, 1577 (11th Cir. 1994) (emphasis in original) (internal quotes omitted).  Here, and as the defendants acknowledge, (Doc. 31 at 4 n.6), damages are sought against the defendants explicitly and exclusively in their individual capacities.  "The essence of an individual capacity suit is that the plaintiff is seeking to recover from the individual defendant, who is personally liable for the judgment." *Jackson*, 16 F.3d at 1577.  The defendants offer no explanation how damages sought only from them personally could under no circumstances be paid with non-state funds.  That silence is fatal to their argument.

### B.  Qualified Immunity.

"[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  "[T]he burden is first on the defendant to establish that the allegedly unconstitutional conduct occurred while he was acting within the scope of his discretionary authority." *Harbert*, 157 F.3d at 1281.  The burden then shifts to the plaintiff to show that the defendant's conduct "violated a clearly established statutory or constitutional right." *Grayden v. Rhodes*, 345 F.3d 1225, 1231 (11th Cir. 2003).

### 1.  Discretionary authority.

"[T]he burden is first on the defendant to establish that the allegedly unconstitutional conduct occurred while he was acting within the scope of his discretionary authority. ...  If, and only if, the defendant does that will the burden shift to the plaintiff to establish that the defendant violated clearly established law." *Harbert*, 157 F.3d at 1281 (emphasis added).  The reason is that an official

---

nominal damages."  (Doc. 31 at 5).  The defendants' reply brief again expresses the issue in identical language.  (Doc. 43 at 7).

acting outside the scope of his discretionary authority "ceases to act as a government official and instead acts on his own behalf," so that "the policies underlying the doctrine of qualified immunity no longer support its application." *Id.*

For purposes of federal qualified immunity analysis, a defendant acts within his discretionary authority when "his actions were undertaken pursuant to the performance of his duties and within the scope of his authority." *Rich v. Dollar*, 841 F.2d 1558, 1564 (11th Cir. 1988) (internal quotes omitted). For this inquiry, "[w]e ask whether the government employee was (a) performing a legitimate job-related function (that is, pursuing a job-related goal), (b) through means that were within his power to utilize." *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1265 (11th Cir. 2004).

The first prong of this test requires that the defendant "have been performing a function that, but for the alleged unconstitutional infirmity, would have fallen within his legitimate job description." *Holloman*, 370 F.3d at 1266 (emphasis omitted). "The inquiry is not whether it was within the defendant's authority to commit the allegedly illegal act," but "whether the act complained of, if done for a proper purpose, would be within, or reasonably related to, the outer perimeter of an official's discretionary duties." *Harbert*, 157 F.3d at 1282 (internal quotes omitted).[8]

As for the second prong, "[e]ach government employee is given only a certain 'arsenal' of powers with which to accomplish her goals." *Holloman*, 370 F.3d at 1267. "Pursuing a job-related goal through means that fall outside the range of discretion that comes with an employee's job is not protected by qualified immunity." *Id.*

---

[8] For example, the issue is not whether a marshal has the authority to deliver a prisoner into unconstitutional conditions but whether he has the authority to transport and deliver prisoners. *Harbert*, 157 F.3d at 1282 (describing *Jordan v. Doe*, 38 F.3d 1559, 1566 (11th Cir. 1994)).

The quantum and quality of evidence necessary to meet the defendant's burden "vary in proportion to the degree of discretion inherent in the defendant's office," *Harbert*, 157 F.3d at 1282 (internal quotes omitted), but ordinarily "there must be a showing by competent summary judgment materials of objective circumstances that would compel th[e] conclusion" that the defendant acted within his discretionary authority. *Id*. (internal quotes omitted). Certainly "[a] bald assertion that the acts were taken pursuant to the performance of duties and within the scope of duties will not suffice" to meet the defendant's burden of proof. *Id*. (internal quotes omitted). However, when it is "undisputed … that the [defendants] were acting within their discretionary authority," the Court can deem that element of qualified immunity established. *E.g., Lewis v. City of West Palm Beach*, 561 F.3d 1288, 1291 (11th Cir. 2009). The plaintiff does not dispute the defendants' contention that they acted within their discretionary authority, and the allegations of the amended complaint affirmatively establish this element.

The amended complaint alleges that Waldrop participated in the process to create the First and Second Policies; gave final approval for their adoption; directed that changes be made to the First Policy; failed to direct that changes be made to the Second Policy; delegated authority to enforce the First Policy to Smith and Mitchell; and permitted other student organizations to hang sheet signs on campus. (Doc. 29, ¶¶ 27-30, 91, 96). The amended complaint also alleges that Waldrop is responsible for enacting and enforcing all University policies concerning student free speech, including the First and Second Policies; that he must approve in advance all changes to those policies; and that he has final authority to review, approve or reject student requests to use campus facilities and grounds, including the use of sheet signs. (*Id*., ¶¶ 23-26, 31, 90, 102). The

plaintiff thus admits that all of Waldrop's challenged acts and omissions fell within his discretionary authority.[9]

The amended complaint alleges that Smith participated in the process to create the First and Second Policies; gave approval for their adoption; directed that changes be made to the First Policy; failed to direct that changes be made to the Second Policy; and permitted other student organizations to hang sheet signs on campus. (Doc. 29, ¶¶ 38-41, 96). The amended complaint also alleges that Smith is responsible for enacting and enforcing University policies, including the First and Second Policies; that he must approve in advance all changes to those policies; that he has authority to coordinate and approve student solicitation and speech requests, including the use of sheet signs; and that he has authority under the Second Policy to define the boundaries of the Perimeter. (*Id.*, ¶¶ 34-37, 42-43, 102, 168). The plaintiff thus admits that all of Smith's challenged acts and omissions fell within his discretionary authority.

The amended complaint alleges that Mitchell participated in the process to create the First and Second Policies; gave approval for their adoption; failed to direct that changes be made to the Second Policy; enforced the First Policy against The plaintiff regarding its distribution of pro-life information and hosting of a cemetery of innocents by restricting the plaintiff to the Speech Zone; and permitted other student organizations to hang sheet signs on campus. (Doc. 29, ¶¶ 53, 55-57, 96, 114, 130-32, 145, 231). The amended complaint also alleges that Mitchell is responsible for enacting and enforcing University policies, including the First and Second Policies; that he is responsible for reviewing and giving final approval or disapproval to student requests to engage in expressive speech, including the use of sheet signs; that he was responsible for regulating the Speech Zone under the First Policy; and that he is responsible for regulating the Perimeter

---

[9] Omissions as well as acts are subject to qualified immunity if they "occurred while [the defendant] was engaged in a discretionary duty." *Goebert v. Lee County*, 510 F.3d 1312, 1329 (11th Cir. 2007).

under the Second Policy.  (*Id.*, ¶¶ 47-51, 54).  The plaintiff thus admits that all of Mitchell's challenged acts and omissions fell within his discretionary authority.

The amended complaint alleges that, in October 2013 and February 2014, Steadman denied the plaintiff permission to engage in speech on the grounds outside Shelby Hall.  (Doc. 29, ¶¶ 61, 119, 123-26, 129, 132).  The amended complaint also alleges that Steadman was responsible for enforcing the First Policy on the University grounds around Shelby Hall, including deciding whether to approve or deny student speech requests.  (*Id.*, ¶ 60).  The plaintiff thus admits that all of Steadman's challenged acts and omissions fell within his discretionary authority.

### 2.  Clearly established right.

The lower courts have discretion whether to address first the existence of a constitutional violation or the clearly established nature of the right allegedly violated.  *Pearson v. Callahan*, 555 U.S. 223, 236 (2009); *accord Reichle v. Howards*, 132 S. Ct. 2088, 2093 (2012).  To avoid "the often more difficult question whether the purported right exists at all," *id.*, the Court addresses first the latter issue.

"The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."  *Saucier v. Katz*, 533 U.S. 194, 202 (2001).  "In other words, existing precedent must have placed the statutory or constitutional question beyond debate."  *Reichle*, 132 S. Ct. at 2093 (internal quotes omitted).  "The salient question … is whether the state of the law at the time of an incident provided fair warning to the defendants that their alleged conduct was unconstitutional."  *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014).  To attain that level, "the right allegedly violated must be established, not as a broad general proposition, … but in a particularized sense so that the contours of the

right are clear to a reasonable official." *Reichle*, 132 S. Ct. at 2094.  The law is clearly established if any of three situations exists.

"First, the words of the pertinent federal statute or constitutional provision in some cases will be specific enough to establish clearly the law applicable to particular conduct and circumstances to overcome qualified immunity, even in the total absence of case law." *Vinyard v. Wilson*, 311 F.3d 1340, 1350 (11th Cir. 2002) (emphasis omitted).  The requisite fair and clear notice can be given without case law only "[i]n some rare cases." *Williams v. Consolidated City of Jacksonville*, 341 F.3d 1261, 1270 (11th Cir. 2003).

"Second, ... some broad statements of principle in case law are not tied to particularized facts and can clearly establish law applicable in the future to different sets of detailed facts." *Vinyard*, 311 F.3d at 1351.  "For example, if some authoritative judicial decision decides a case by determining that 'X Conduct' is unconstitutional without tying that determination to a particularized set of facts, the decision on 'X Conduct' can be read as having clearly established a constitutional principle: put differently, the precise facts surrounding 'X Conduct' are immaterial to the violation." *Id*.  "[I]f a broad principle in case law is to establish clearly the law applicable to a specific set of facts facing a government official, it must do so with obvious clarity to the point that every objectively reasonable government official facing the circumstances would know that the official's conduct did violate federal law when the official acted." *Id*. (internal quotes omitted).  "[S]uch decisions are rare," and "broad principles of law are generally insufficient to clearly establish constitutional rights." *Corey Airport Services, Inc. v. Decosta*, 587 F.3d 1280, 1287 (11th Cir. 2009).

"Third, [when] the Supreme Court or we, or the pertinent state supreme court has said that 'Y Conduct' is unconstitutional in 'Z Circumstances,'" then if "the circumstances facing a government official are not fairly distinguishable, that is, are materially similar [to those involved in the opinion], the precedent can clearly establish the applicable law." *Vinyard*, 311 F.3d at 1351-52.

When case law is utilized to show that the law was clearly established, the plaintiff must "point to law as interpreted by the Supreme Court [or] the Eleventh Circuit," and such case law must pre-date the challenged conduct.  *Mercado v. City of Orlando*, 407 F.3d 1152, 1159 (11th Cir. 2005); *accord Coffin v. Brandau*, 642 F.3d 999, 1013 (11th Cir. 2011) (en banc).[10]  Moreover, "[t[he law cannot be established by dicta[, which] is particularly unhelpful in qualified immunity cases where we seek to identify clearly established law."  *Santamorena v. Georgia Military College*, 147 F.3d 1337, 1342 n.13 (11th Cir. 1998) (internal quotes omitted).

As is generally the case under Rule 56, "[w]e resolve all issues of material fact in favor of the plaintiff, and then determine the legal question of whether the defendant is entitled to qualified immunity under that version of the facts."  *Durruthy v. Pastor*, 351 F.3d 1080, 1084 (11th Cir. 2003).

As noted, the plaintiff brings free speech, due process and equal protection challenges.  The Court considers them in turn.

**a.  Free speech.**

"[T]he Supreme Court has broadly discerned three distinct (although not airtight) categories of government property for First Amendment purposes: traditional public fora, designated public fora, and limited public fora."  *Bloedorn v. Grube*, 631 F.3d 1218, 1230 (11th Cir. 2011).  Identifying which is at issue is important, because "the degree of scrutiny we place on a government's restraint of speech is largely governed by the kind of forum the government is attempting to regulate."  *Id*.  The plaintiff, relying on *Bloedorn* and other cases, argues that this case involves only traditional and/or designated public fora.

---

[10] The plaintiff relies on a large number of trial court decisions and appellate opinions from other circuits.  Because they are legally irrelevant to the task at hand, the Court ignores them.

"Traditional public fora are public areas such as streets and parks that, since time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions."  *Bloedorn*, 631 F.3d at 1231 (internal quotes omitted).  The plaintiff asserts that the Perimeter is a traditional public forum "because it is a park-like area with lawns, picnic benches, and trees next to" public sidewalks.  (Doc. 41 at 24-25).  The only Supreme Court or Eleventh Circuit case the plaintiff cites for this proposition is *Bloedorn*, which does not support it.  On the contrary, that case instructs that "[t]he physical characteristics of the property alone cannot dictate forum analysis."  631 F.3d at 1233.  Thus, "it is of lesser significance that the [campus] sidewalks and Pedestrian Mall physically resemble municipal sidewalks and public parks," because a college campus "differs in many important ways from public streets or parks," especially in that "the purpose of a university is strikingly different from that of a public park."  *Id*. at 1233-34.  In short, "a state-funded university is not a traditional public forum …."  *Id*. at 1232.  The plaintiff has thus failed to meet its burden of showing it is clearly established that the Perimeter is a traditional public forum.[11]

"A designated public forum is government property that has not traditionally been regarded as a public forum but that has been intentionally opened up for that purpose.  …  To create a designated public forum, the government must intentionally open up a location … for use by the public at large."  *Bloedorn*, 631 F.3d at 1231 (internal quotes omitted).  The plaintiff asserts that the "the remaining outdoor areas of the campus" (that is, everything other than the Perimeter) constitute a designated public forum.  (Doc. 41 at 24-25).  Under the First Policy, the University "restricted student speech to one small speech zone

---

[11] The plaintiff also suggests, without argument or explanation, that "the interior of the University's campus is a traditional … public forum."  (Doc. 41 at 15).  The discussion in text reflects the plaintiff' failure to show that any such proposition is clearly established under Supreme Court and/or Eleventh Circuit jurisprudence.

that occupied less than 0.01% of the University's main campus," although administrators had discretion to allow speech elsewhere.  (Doc. 29, ¶ 2).  Under the Second Policy, student speech is permitted in additional areas but prohibited in others.  (Doc. 29-10 at 3-4).  The plaintiff offers no Supreme Court or Eleventh Circuit authority (or any other) for the proposition that an entire property can be a designated public forum when the government body identifies only a part of the property as appropriate for expressive speech.

The plaintiff cites *Sentinel Communications Co. v. Watts*, 936 F.2d 1189 (11th Cir. 1991), as "refer[ring] to the outdoor areas of campus as designated public fora for the plaintiff."  (Doc. 41 at 25).  In fact, *Sentinel* merely noted that certain state property "may be" designated as a public forum, 936 F.2d at 1202 (internal quotes omitted), as could any part of any government property.  The question, though, is not what can be a designated public forum but what, in a particular case, has become a designated public forum pursuant to government designation.  *Sentinel* does not address the latter issue and so does not advance the plaintiff's position.

The plaintiff also points to *Bloedorn*.  Unlike a designated public forum, which the government opens to "the public at large," 631 F.3d at 1231, "a limited public forum may be established when the government limits its property to use by certain groups or dedicates it solely to the discussion of certain subjects."  *Id*. (internal quotes omitted).  The *Bloedorn* Court held that, when a university "expressed no intention to open [certain] areas to the general public for expressive conduct [but] limited these areas only for use by a discrete group of people – the [university] community; its the plaintiff, faculty, and employees; and their sponsored guests," such restriction "is precisely the definition of a limited public forum."  *Id*. at 1232.  The plaintiff asserts that this passage from *Bloedorn* establishes that, when a campus location is opened to the university community but not the general public, the location is a limited public forum vis-à-vis the general public but a designated public forum vis-à-vis the university community.

(Doc. 41 at 26 n.10). *Bloedorn*, however, does not state that the same location can simultaneously be a limited public forum as to some and a designated public forum as to others, and its statement that a designated public forum must be opened up to "the public at large" would make such a construction difficult if not untenable. Certainly *Bloedorn* does not clearly establish for purposes of qualified immunity analysis the proposition for which the plaintiff contends.

"Any restrictions made on expressive activity in a limited public forum only must be reasonable and viewpoint neutral," while "a time, place, and manner restriction can be placed on a designated public forum only if it is content neutral, narrowly tailored to achieve a significant government interest, and leaves open ample alternative channels of communication." *Bloedorn*, 631 F.3d at 1231. The plaintiff points out that the Second Policy provides that "expressive activities may be subject to reasonable regulation with regard to the time, place, and manner." (Doc. 29-10 at 2). The plaintiff concludes that the "campus is a traditional or designated public forum" because the Second Policy employs the stock phrase, "time, place and manner," which terminology the plaintiff apparently believes cannot be used in the context of a limited public forum. (Doc. 41 at 26 n.9). The plaintiff is wrong, as *Bloedorn* itself did so. 631 F.3d at 1235 (because certain locations "are limited public fora, any time, place, and manner restrictions made on expressive activity need only be viewpoint neutral and reasonable").

Finally, (Doc. 41 at 26), the plaintiff notes that "the campus of a public university, at least for its plaintiff, possesses many of the characteristics of a public forum." *Widmar v. Vincent*, 454 U.S. 263, 267 n.5 (1981). This is far too general a statement to clearly establish that the entire outdoor portion of the University's campus is a public forum, since sharing certain qualities of a public forum is not the same as being a public forum. Indeed, the very same footnote reminds readers that "[w]e have not held … that a university must grant free access to all of its grounds or buildings." *Id.*

Although the defendants have not shown it is clearly established that the entire outdoor area of campus was a designated public forum, they may still show it is clearly established that certain portions of campus are or were a designated public forum.  The Court therefore examines each policy in light of the principles set forth above.

The First Policy, which contained no restriction on the subjects that could be discussed, provided that demonstrations, speeches and debates, including those by "unsponsored" speakers, were to be held in the Speech Zone unless permission to use another location was granted.  (Doc. 29-5 at 6).  The *Bloedorn* Court equated "non-sponsored speakers" with those "drawn from the general public" but not "sponsored by community members."  631 F.3d at 1225-26.  It is thus clearly established that the Speech Zone was a designated public forum rather than a limited public forum under the First Policy.  *See id*. at 1234 (where "the University ha[d] intentionally opened this limited space … to its student body and to the general public without any restrictions on content," it had created a designated public forum).  The defendants make no argument to the contrary.

The Second Policy provides that the plaintiff and employees may engage in outdoor expressive activity in "all areas of the University campus," with several excepted areas.  (Doc. 29-10 at 3-4).  However, outdoor expressive activity by non-University sponsored persons or groups is restricted to the Speech Zone.  (*Id*. at 3).  Because expressive speech outside the Speech Zone is open only to a "discrete group of people," *Bloedorn*, 631 F.3d at 1231, it is not clearly established that any area outside the Speech Zone is a designated public forum under the Second Policy.[12]

In sum, for purposes of the pending motion, the plaintiff has met its burden of showing it is clearly established that the Speech Zone was a designated public

---

[12] The areas opened by the Second Policy to expressive activity by the University community but not by outsiders would be a limited public forum under *Bloedorn*.  631 F.3d at 1231.

forum under the First Policy and that it remains a designated public forum under the Second Policy.  However, the plaintiff has not met its burden of showing it is clearly established that any other area of campus was a traditional public forum or a designated public forum under the First or Second Policy.

Unfortunately for the plaintiff, its entire argument depends on the premise of a traditional or designated public forum, and the plaintiff invokes only the test for permissible regulation applicable to such fora.  (Doc. 41 at 27-28).  This renders the plaintiff's argument incapable of carrying its burden of showing that the First and Second Policies violate its clearly established First Amendment rights.[13]

The plaintiff might nevertheless defeat qualified immunity to the extent it challenges the First or Second Policy's regulation of the Speech Zone, since that area is a designated public forum as to which the plaintiff' proposed test applies. The plaintiff, however, mounts no such challenge.  As to the First Policy, the plaintiff objects to:  the discretion vested in administrators in deciding whether to allow expressive activity outside the Speech Zone; the advance notice required to obtain permission to speak outside the Speech Zone; the loss of anonymity associated with requests for permission to speak outside the Speech Zone; the requirement of a permit to speak outside the Speech Zone even when only an individual or small group is involved; the absence of additional designated public fora; and the University's denials of the plaintiff's requests to hold a cemetery of

---

[13] As the plaintiff acknowledges, (Doc. 41 at 24-25, 28), "a time, place, and manner restriction can be placed on a designated [or traditional] public forum only if it is content neutral, narrowly tailored to achieve a significant government interest, and leaves open ample alternative channels of communication." *Bloedorn*, 631 F.3d at 1231.  As the plaintiff also acknowledges, (Doc. 41 at 26 n.9), "[a]ny restrictions made on expressive activity in a limited public forum only must be reasonable and viewpoint neutral." *Bloedorn*, 631 F.3d at 1231.

innocents outside the Speech Zone.  (Doc. 41 at 27-28, 30-31, 33, 35-36).[14]  As to the Second Policy, the plaintiff objects to the banning of expressive activity in the Perimeter and the discretion vested in administrators to determine its interior boundary.  (*Id*. at 28, 31-32, 36-37, 38).

The only issue raised by the plaintiff that might arguably implicate regulation of the Speech Zone is the objection that the Speech Zone is too small.  (Doc. 41 at 36).  Because the plaintiff cites only trial court opinions in support of this objection, (*id*.), it plainly has not carried its burden of demonstrating it is clearly established that the size of the Speech Zone violates the First Amendment.

As the plaintiff notes, (Doc. 41 at 24-25, 26 n.9), one rule applies both to traditional/designated public fora and to limited public fora.  "[E]ven in a non-public forum, the law is clearly established that the state cannot engage in viewpoint discrimination – that is, the government cannot discriminate in access to the forum on the basis of the government's opposition to the speaker's viewpoint."  *Cook v. Gwinnett County School District*, 414 F.3d 1313, 1321 (11th Cir. 2005).  The plaintiff argues that Mitchell and Steadman engaged in content discrimination and viewpoint discrimination when, while the First Policy was in force, they denied the plaintiff permission to place a cemetery of innocents in the Perimeter.

---

[14] At times in its briefing, the plaintiff seems to suggest that loss of spontaneity and anonymity apply to speech in the Speech Zone, (Doc. 41 at 35, 38), but the express terms of the First Policy render any such unstated suggestion untenable:

> Demonstrations, speeches, and debates will be held around the Student Center unless the Vice President for Student Affairs is able to coordinate *another appropriate campus location* no less than three working days prior to the event.  Authorization for any speech or demonstration *beyond the Student Center* will require identification of the individual or organization involved ….

(Doc. 29-5 at 6 (emphasis added)).

(Doc. 41 at 33).[15]  The plaintiff has evidence that permission was denied because the plaintiff "advocates for a position that involves political and social controversy."  (Doc. 29-6).  The Court agrees with the plaintiff that this e-mail constitutes evidence that Mitchell and Steadman denied permission due to the plaintiff's viewpoint ("position") on abortion (pro-life).  Because it was clearly established in February 2014 that such viewpoint discrimination violates the First Amendment, Mitchell and Steadman cannot receive qualified immunity with regard to these denials.[16]

### b.  Due process - overbreadth.

The plaintiff argues that the First and Second Policies violate its due process rights under the Fourteenth Amendment because the policies are overbroad.  (Doc. 41 at 39).  In the first place, the amended complaint limits the plaintiff's due process claim to one of vagueness, to the exclusion of overbreadth. (Doc. 29 at 32-34).  In the second place, the only two cases cited by the plaintiff involve free speech challenges, not due process challenges.  In the third place, those cases address overbreadth only in the context of a traditional public forum, which renders them irrelevant to the present context.  For all these reasons, the plaintiff has failed to meet its burden of demonstrating it is clearly established that the First and Second Policies violate the plaintiff' due process rights.

---

[15] In contrast to viewpoint neutrality, content neutrality is not always required in a limited public forum.  "[I]n determining whether the State is acting to preserve the limits of the forum it has created so that the exclusion of a class of speech is legitimate, we have observed a distinction between, on the one hand, content discrimination, which may be permissible if it preserves the purposes of that limited forum, and, on the other hand, viewpoint discrimination, which is presumed impermissible when directed against speech otherwise within the forum's limitations."  *Rosenberger v. Rector and Visitors of the University of Virginia*, 515 U.S. 819, 829-30 (1995).

[16] Mitchell and Steadman argue they could not have had fair notice of any constitutional infirmity because the First Policy "has never been declared unconstitutional or even challenged as such until this lawsuit was filed."  (Doc. 31 at 8).  As discussed in text, this is not the test of whether their conduct violates a clearly established constitutional right.

### c.  Due process – vagueness.

The plaintiff also argues that the First and Second Policies violate its due process rights under the Fourteenth Amendment because the policies are vague. (Doc. 41 at 40).  The only three cases cited by the plaintiff address vagueness in the context of a criminal statute, not a policy creating designated and/or limited public fora, which renders them irrelevant to the present context.  The plaintiff has thus failed to carry its burden of showing it is clearly established that the First and Second Policies violate the plaintiff' due process rights.

### d.  Equal protection.

The plaintiff argues that the First and Second Policies, as written and as applied, violate its equal protection rights under the Fourteenth Amendment. (Doc. 41 at 41).  The single case cited by the plaintiff – which did not involve expressive activity – is offered only for the bland proposition that similarly situated persons should be treated similarly.  (*Id*.).  What the plaintiff fails to provide is any authority from which it could be clearly established that those treated more favorably than the plaintiff – an engineering club that hosted a jousting event in the Perimeter, the students who talk/eat/study/play/hang out in the Perimeter, and student groups that hang sheet signs advertising campus events and elections in a traffic circle – are similarly situated to an organization that desires to use these areas, not to play or to publicize campus activities, but to "promote and defend the culture of life."  (Doc. 29, ¶¶ 70, 96, 103-06, 127-28, 137-38, 165-67).  The plaintiff has thus failed to demonstrate it is clearly established that the First and Second Policies violate the plaintiff' equal protection rights.

### III.  Second Policy.

The plaintiff challenges the Second Policy "on its face and as applied." (Doc. 29, ¶ 8).  The defendants argue that the as-applied claim is inadequately pleaded because the amended complaint does not allege facts "to show that any Defendant has applied the Second Policy to [The plaintiff] at all."  (Doc. 31 at 12).

The defendants misapprehend the nature of an as-applied challenge.  While "[a] facial challenge asserts that a law *always* operates unconstitutionally," an as-applied challenge "asserts that a statute cannot be constitutionally applied in particular circumstances."  *Harris v. Mexican Specialty Foods, Inc*., 564 F.3d 1301, 1308 (11th Cir. 2009) (emphasis in original) (internal quotes omitted). While such claims often address an historical application of the rule to the plaintiff, they can be brought without such an application, as occurred in *Harrell*. Because the defendants have not attempted to demonstrate that the plaintiff is required to plead an affirmative application to it of the Second Policy, they cannot obtain dismissal on the ground that the plaintiff failed to do so.[17]

In similar fashion, the defendants complain that the amended complaint fails to allege that any other student organization has engaged in protected speech (as opposed to recreation) in the Perimeter.  (Doc. 31 at 12-13).  Such an omission might be relevant to the plaintiff' equal protection claim, but the defendants have not explained how it could impact the plaintiff' due process and free speech claims.  Nor have they attempted to demonstrate that, as a matter of law, an equal protection claim cannot be based on the preferential treatment of such organizations.  The defendants have therefore failed to show that the amended complaint is legally deficient.

---

[17] Given that the Second Policy explicitly closes the Perimeter to expressive activities, (Doc. 29-10 at 3-4), and given that even under the First Policy the University twice refused The plaintiff permission to use the Perimeter, the defendants would have a difficult climb were they to argue that the controversy is not ripe absent another request to use the Perimeter.  *See Harrell*, 608 F.3d at 1262 (an as-applied challenge is ripe absent an actual application when it addresses a rule "whose application is categorical and thus clear").

## CONCLUSION

For the reasons set forth above, the defendants' motion to dismiss is **granted** as to all claims for declaratory or injunctive relief with respect to the First Policy and is **granted** as to all claims for nominal damages not based on alleged viewpoint discrimination in violation of the First Amendment by Mitchell and Steadman in denying permission to use the Perimeter for a cemetery of innocents. In all other respects, the motion to dismiss is **denied**.

DONE and ORDERED this 4th day of February, 2015.

s/ WILLIAM H. STEELE
CHIEF UNITED STATES DISTRICT JUDGE