IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| STUDENTS FOR LIFE USA, etc., | ) |
| | ) |
|   Plaintiff, | ) |
| | ) |
| v. | ) CIVIL ACTION 14-0157-WS-B |
| | ) |
| TONY G. WALDROP, etc., et al., | ) |
| | ) |
|   Defendants. | ) |

## ORDER

This matter is before the Court on the parties' cross-motions for summary judgment.  (Docs. 97, 100).  The parties have filed briefs and evidentiary materials in support of their respective positions, (Docs. 98-99, 101-04, 106-08, 110-11), and the motions are ripe for resolution.  After careful consideration, the Court concludes that both motions are due to be granted in part and denied in part.[1]

## BACKGROUND

According to the amended complaint, (Doc. 29), the plaintiff is a student organization at the University of South Alabama ("the University"), located in Mobile, Alabama.  The plaintiff seeks to promote its pro-life message through flyers, signs, peaceful demonstrations and other means.  In October 2013 and again in February 2014, the plaintiff sought permission to place a "cemetery of

---

[1] In addition to their 30-page brief, (Doc. 98), the defendants filed an eight-page motion containing assertions of fact and legal argument.  (Doc. 97).  This is an improper skirting of the District's 30-page limitation on the length of principal briefs.  Civil Local Rule 7(e).  *See, e.g., State Farm Fire & Casualty Co. v. Richardson*, 2008 WL 4531765 at *1 n.1 (S.D. Ala. 2008) ("The 30-page briefing limitation … would be meaningless if a party could disaggregate the fact and law portions of its brief into two different filings."). "Like its sister courts, the Court will not countenance any attempt to avoid the page limit requirement of the Local Rules."  *FNB Bank v. Park National Corp.*, 2013 WL 68427788 at *1 n.1 (S.D. Ala. 2013) (internal quotes omitted).

innocents" at various campus locations, including an area between an academic building ("Shelby Hall") and two intersecting public roads ("Old Shell Road" and "University Boulevard").  Permission to use such locations was denied by University officials.  The plaintiff ultimately utilized an area around the student center ("the Speech Zone") that the University's policy ("the First Policy") identified as the only campus location permitted to be used for student speech.  In August 2014, the University adopted another policy ("the Second Policy"), which expands the locations that can be used for student speech but which continues to prohibit such speech within an area ("the Perimeter") that includes most spaces between the street side of campus buildings and the public sidewalks paralleling Old Shell Road and University Boulevard.  (*Id*. at 4, 11, 13-20).

The amended complaint names as defendants, in their individual and official capacities:  (1) the University's president, Tony Waldrop; (2) its vice-president for student affairs, John Smith; (3) its assistant vice-president for student affairs and dean of students, Michael Mitchell; and (4) the dean of its college of engineering, John Steadman.  (Doc. 29 at 1).

Count One of the amended complaint alleges that the First and Second Policies violate the plaintiff's First Amendment rights of free speech.  Count Two alleges that the First and Second Policies violate the plaintiff's due process rights, while Count Three alleges the policies violate the plaintiff's equal protection rights.  The amended complaint seeks as relief:  (1) a declaration that the Policies violate the plaintiff's constitutional rights; (2) an injunction against enforcement of the Policies and associated practices; (3) an award of nominal damages against the defendants individually; and (4) attorney's fees and costs.  (Doc. 29 at 26-38).

The Court granted the defendants' motion to dismiss the amended complaint's requests for declaratory and injunctive relief with respect to the First Policy, on the grounds of mootness.  (Doc. 49 at 3-10, 29).  The Court also granted, on the grounds of qualified immunity, the motion to dismiss the amended complaint's demand for nominal damages against the individual defendants,

except to the extent the demand is based on alleged viewpoint discrimination in violation of the First Amendment by Mitchell and Steadman in denying permission (under the First Policy) to use what is now the Perimeter for a cemetery of innocents. (*Id*. at 13-27, 29). The parties' cross-motions seek summary judgment in their favor as to all claims remaining after these rulings.[2]

## DISCUSSION

Summary judgment should be granted only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir. 1991). The moving party may meet its burden in either of two ways: (1) by "negating an element of the non-moving party's claim"; or (2) by "point[ing] to materials on file that demonstrate that the party bearing the burden of proof at trial will not be able to meet that burden." *Id.* "Even after *Celotex* it is never enough simply to state that the non-moving party cannot meet its burden at trial." *Id.*; *accord Mullins v. Crowell*, 228 F.3d 1305, 1313 (11th Cir. 2000); *Sammons v. Taylor*, 967 F.2d 1533, 1538 (11th Cir. 1992).

---

[2] The plaintiff's motion nominally seeks judgment in the plaintiff's favor "on all remaining causes of action," including the due process and equal protection claims regarding the Second Policy. (Doc. 100 at 1-2). The plaintiff's briefing in support of its motion, however, addresses the Second Policy only with respect to its First Amendment aspect. (Docs. 101, 110). The plaintiff's brief in opposition to the defendants' motion for summary judgment addresses the due process and equal protection claims in a single page. (Doc. 106 at 37). The defendants do not argue that the plaintiff's laconic briefing of itself precludes summary judgment in the plaintiff's favor, and the Court will not do so on their behalf.

Even though the plaintiff's demand for nominal damages in connection with the Second Policy has already been dismissed, (Doc. 49 at 25-26, 29), the plaintiff's motion for summary judgment seeks such an award. (Doc. 100 at 2). The plaintiff has since "withdraw[n] its damages request." (Doc. 110 at 20).

"When the *moving* party has the burden of proof at trial, that party must show *affirmatively* the absence of a genuine issue of material fact: it must support its motion with credible evidence ... that would entitle it to a directed verdict if not controverted at trial. [citation omitted] In other words, the moving party must show that, on all the essential elements of its case on which it bears the burden of proof, no reasonable jury could find for the nonmoving party." *United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1438 (11th Cir. 1991) (en banc) (emphasis in original); *accord Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993).

"If the party moving for summary judgment fails to discharge the initial burden, then the motion must be denied and the court need not consider what, if any, showing the non-movant has made." *Fitzpatrick*, 2 F.3d at 1116; *accord Mullins*, 228 F.3d at 1313; *Clark*, 929 F.2d at 608.

"If, however, the movant carries the initial summary judgment burden ..., the responsibility then devolves upon the non-movant to show the existence of a genuine issue of material fact." *Fitzpatrick*, 2 F.3d at 1116. "If the nonmoving party fails to make 'a sufficient showing on an essential element of her case with respect to which she has the burden of proof,' the moving party is entitled to summary judgment." *Clark*, 929 F.2d at 608 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)) (footnote omitted); *see also* Fed. R. Civ. P. 56(e)(2) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may … consider the fact undisputed for purposes of the motion ….").

In deciding a motion for summary judgment, "[t]he evidence, and all reasonable inferences, must be viewed in the light most favorable to the nonmovant …." *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1243 (11th Cir. 2003).

There is no burden on the Court to identify unreferenced evidence supporting a party's position.[3]  Accordingly, the Court limits its review to the exhibits, and to the specific portions of the exhibits, to which the parties have expressly cited.  Likewise, "[t]here is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment," *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995), and the Court accordingly limits its review to those arguments the parties have expressly advanced.

## I.  Second Policy.

The Second Policy provides in pertinent part as follows:

> For USA students or employees, all areas of the University campus are open for expressive activities, except for the following:
> - Areas between the street side of University buildings and facilities on the periphery of campus from the portal of North Drive to the corner of campus at Old Shell Road and University Boulevard and to the portal of Stadium Drive and the public sidewalks ….

(Doc. 29-10 at 3-4).  This closing of the Perimeter to expressive activity is the plaintiff's sole challenge to the Second Policy.  (Doc. 29 at 27-30, 33, 36).  As noted, the amended complaint alleges that the Second Policy violates the plaintiff's free speech, due process and equal protection rights.  (*Id*. at 26-37).

---

[3] Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials, but it may consider other materials in the record."); *accord Adler v. Wal-Mart Stores, Inc*., 144 F.3d 664, 672 (10th Cir. 1998) ("The district court has discretion to go beyond the referenced portions of these [summary judgment] materials, but is not required to do so.").  "[A]ppellate judges are not like pigs, hunting for truffles buried in briefs," and "[l]ikewise, district court judges are not required to ferret out delectable facts buried in a massive record …."  *Chavez v. Secretary, Florida Department of Corrections*, 647 F.3d 1057, 1061 (11th Cir. 2011) (internal quotes omitted).

**A. Free Speech.**

"[T]he Supreme Court has broadly discerned three distinct (although not airtight) categories of government property for First Amendment purposes: traditional public fora, designated public fora, and limited public fora." *Bloedorn v. Grube*, 631 F.3d 1218, 1230 (11th Cir. 2011). Identifying which is at issue is important, because "the degree of scrutiny we place on a government's restraint of speech is largely governed by the kind of forum the government is attempting to regulate." *Id*. For both traditional and designated public fora, "a time, place, and manner restriction can be placed … only if it is content neutral, narrowly tailored to achieve a significant government interest, and leaves open ample alternative channels of communication." *Id*. at 1231 (internal quotes omitted). In contrast, "[a]ny restrictions made on expressive activity in a limited public forum only must be reasonable and viewpoint neutral." *Id*.[4]

---

[4] The Supreme Court has recently defined a "traditional public forum" as a place, "such as a street or a park, which has immemorially been held in trust for the use of the public and, time out of mind, has been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Walker v. Sons of Confederate Veterans, Inc.*, 135 S. Ct. 2239, 2250 (2015) (internal quotes omitted). The *Walker* Court described a "designated public forum" as one "which exists where government property that has not traditionally been regarded as a public forum is intentionally opened up for that purpose." *Id*. (internal quotes omitted). The *Walker* Court depicted a "limited public forum" as "exist[ing] where a government has reserved a forum for certain groups or for the discussion of certain topics." *Id*. (internal quotes omitted). The *Walker* Court also identified a fourth type of forum – a "nonpublic forum, which exists where the government is acting as proprietor, managing its internal operations." *Id*. at 2251 (internal quotes omitted).

The Supreme Court has at other times used different or overlapping terminology to describe the same sorts of fora. In *Arkansas Educational Television Commission v. Forbes*, 523 U.S. 666 (1998), for example, the Court listed the types of fora as traditional public forum, designated public forum, nonpublic forum (what *Walker* and other cases call a limited public forum) and non-forum. *Id*. at 677. The Supreme Court has sometimes used "limited public forum" to indicate a forum that is a designated public forum as to some and not a public forum as to others. *See Cornelius v. NAACP Legal Defense and Educational Fund, Inc.*, 473 U.S. 788, 811 (1985); *see also International Society for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 677 (1992) ("The second category of public property is the designated public forum, whether of a limited or

### 1.  Traditional public forum.

In support of its motion for preliminary injunction, the plaintiff argued that the Perimeter constitutes a traditional public forum, that is, one of the "public areas such as streets and parks that, since time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Bloedorn*, 631 F.3d at 1231 (internal quotes omitted).  For a number of reasons – including the *Bloedorn* Court's pronouncement that "a state-funded university is not a traditional public forum," *id*. at 1232 – the Court concluded that the plaintiff had not shown a substantial likelihood of prevailing on its argument that the Perimeter is a traditional public forum.  (Doc. 55 at 3-11).  The plaintiff does not on the present motions argue that the Perimeter is or could be a traditional public forum.  To the uncertain extent the plaintiff has not abandoned such an argument, the Court holds, for reasons expressed in its order denying preliminary injunctive relief, that the Perimeter is not a traditional public forum.

### 2.  Designated public forum.

The plaintiff asserts that the Perimeter is a designated public forum.  "We have held that a government entity may create a 'designated public forum' if government property that has not traditionally been regarded as a public forum is intentionally opened up for that purpose." *Pleasant Grove City v. Summum*, 555 U.S. 460, 470 (2009).  "Designated public fora … are created by purposeful governmental action." *Arkansas Educational Television Commission v. Forbes*, 523 U.S. 666, 677 (1998).  "The government does not create [i.e., designate] a public forum by inaction or by permitting limited discourse, but only by

---

unlimited character – property that the State has opened for expressive activity by part or all of the public.").  The parties, and the Court, employ the *Walker* labels.

intentionally opening a nontraditional forum for public discourse." *Cornelius v. NAACP Legal Defense and Educational Fund, Inc.*, 473 U.S. 788, 802 (1985). "Public discourse" in this context means "'indiscriminate use.'" *Hazelwood School District v. Kuhlmeier*, 484 U.S. 260, 267 (1988) (quoting *Perry Education Association v. Perry Local Educators' Association*, 460 U.S. 37, 47 (1983)) ("*Perry*"). The government must make the property at issue "generally available"' or "generally open." *Forbes*, 523 U.S. at 678-79. "A designated public forum is not created when the government allows selective access for individual speakers rather than general access for a class of speakers." *Id*. at 679. Thus, "the government does not create a designated public forum when it does no more than reserve eligibility for access to the forum to a particular class of speakers, whose members must then, as individuals, obtain permission." *Id*. (internal quotes omitted).

It is thus the intent of the government to designate a forum as generally open for public discourse that matters, and the question becomes whether the plaintiff has sufficient evidence of such an intent to at least raise a genuine issue of material fact. "[T]he [Supreme] Court has looked to the policy and practice of the government to ascertain whether it intended to designate a place not traditionally open to assembly and debate as a public forum." *Cornelius*, 473 U.S. at 802. "The Court has also examined the nature of the property and its compatibility with expressive activity to discern the government's intent." *Id*; *accord Walker v. Sons of Confederate Veterans, Inc.*, 135 S. Ct. 2239, 2250 (2015).[5]

The Second Policy explicitly limits expressive activity by non-University sponsored individuals and groups (i.e., the general public) to the Speech Zone. (Doc. 29-10 at 3). The plaintiff does not suggest that the University nevertheless has a practice of permitting the general public to engage in expressive activity within the Perimeter. Indeed, the plaintiff does not contest that, as to the general

---

[5] The plaintiff agrees that these are the governing factors. (Doc. 101 at 24, 27).

public, the Perimeter is a limited public forum.  Instead, the plaintiff argues that the Perimeter is a limited public forum as to the general public but a designated public forum as to students and student organizations.

As it did in opposing the defendants' motion to dismiss, the plaintiff relies on *Bloedorn* for the proposition that the same location can be simultaneously a designated public forum as to some and a limited public forum as to others.  While admitting that *Bloedorn* does not contain any such statement,[6] the plaintiff insists that "[i]t makes no sense to say outdoor areas of campus are limited public fora *because* they are reserved for students, only then to say they are also limited public fora *for* those students."  (Doc. 106 at 25 (emphasis in original)).  Without endorsing the plaintiff's reasoning, the Court accepts that the Perimeter could theoretically be a designated public forum as to students despite being a limited public forum as to the general public.[7]

### a.  Policy.

As noted, the Second Policy expressly closes the Perimeter to expressive activity by students (as well as by employees and outsiders).  A clearer expression of intent *not* to make the Perimeter generally open for student discourse is difficult

---

[6] Far from it. "To create a designated public forum, the government must intentionally open up a location or communication channel for use *by the public at large*." 631 F.3d at 1231 (emphasis added). "The University has limited these areas [sidewalks, pedestrian mall and rotunda] *only for use by a discrete group of people* – the [university] community; its students, faculty, and employees; and their sponsored guests. … *This is precisely the definition of a limited public forum*." *Id*. at 1232 (emphasis added).

[7] *See Forbes*, 523 U.S. at 678 (1998) ("The government is free to open additional properties for expressive use by the general public or by a particular class of speakers, thereby creating designated public fora."); *Lee*, 505 U.S. at 677 (a "designated public forum" is one "that the State has opened for expressive activity by part or all of the public."); *Widmar v. Vincent*, 454 U.S. 263, 267-68 (1981) (applying the standard of review applicable to designated public fora when a university "created a forum generally open for use by student groups").

to imagine.  Rather than confront this formidable obstacle, the plaintiff repairs to the student handbook, which states that the University "is a community of scholars in which the ideals of freedom of inquiry, freedom of thought, freedom of expression and freedom of the individual are sustained" and (under the heading of "security policies and procedures") that access to University facilities is generally limited to University "affiliates" such as student groups.  (Doc. 103-22 at 53, 78-79; Doc. 101 at 25).  The plaintiff also selectively quotes from the Second Policy to show that its purpose "is to promote the free exchange of ideas" and accommodate "the rights of students … to speak on campus."  (Doc. 29-10 at 1; Doc. 101 at 25).  But the very most these glittering generalities could establish is a University policy to permit student expressive activity except where it is prohibited; they do not remotely undermine the clarity and efficacy of the Second Policy's ban on expressive activity in the Perimeter.[8]

The plaintiff argues that the Second Policy is, if not irrelevant, at least inconsequential because it is only a self-justifying attempt to say that what is clearly a designated public forum is not.  (Doc. 101 at 26; Doc. 106 at 25-26; Doc. 110 at 17).  The Court accepts that, as the plaintiff's authority states, "consistent practice can on occasion overcome a bare statement of intent to the contrary." *Stewart v. District of Columbia Armory Board*, 863 F.2d 1013, 1017 (D.C. Cir. 1988).  As discussed in Part I.A.2.b, however, the plaintiff has failed to show a consistent or even sporadic practice by the University of authorizing, contrary to its formal policy, indiscriminate use of the Perimeter for general student discourse.

---

[8] The plaintiff stresses that courts in other jurisdictions have considered multiple policies in determining whether a designated public forum had been established.  (Doc. 110 at 17 & n.6).  The Court does not doubt that such an exercise is appropriate; it rules only that the effort is futile in this case, given the policies at issue.  None of the plaintiff's cases remotely support the proposition that a policy as specific and unequivocal as the Second Policy can be neutralized and thus disregarded by resort to other policies as general and vague as those on which the plaintiff seizes.

Reliance on the Second Policy as reflecting an intent not to create a designated public forum is not, as the plaintiff contends, an exercise in "circular reasoning."  What the Fifth Circuit described as circular reasoning was the proposition that a government unit with a "general policy of open access" could cause its property to "cease to be a designated public forum" by the simple expedient of "adopt[ing] a[n] … exceptional regulation" imposing a "specific restriction on speech" without "depart[ing] from [its] consistent practice" of allowing open access, such that "[t]he restriction would disprove any intent to create a designated public forum, and the failure to create a public forum would justify the restriction of speech."  *Hays County Guardian v. Supple*, 969 F.2d 111, 117 (5th Cir. 1992).[9]  Here, the University does not have a general policy of open access to the Perimeter, and it does not suggest that a limited exception to such a policy negates the designated public forum status flowing from the policy.  Instead, the University has an express policy of denying access to the Perimeter for student speech.  This clear expression of intent is precisely what the *Cornelius* analysis requires the Court to weigh against an intent to create a designated public forum.

**b. Practice.**

The Court agrees with the plaintiff, (Doc. 106 at 27), that "[a] policy purporting to keep a forum closed (or open to expression only on certain subjects) is no policy at all for purposes of public forum analysis if, in practice, it is not enforced or if exceptions are haphazardly permitted."  *Hopper v. City of Pasco*, 241 F.3d 1067, 1076 (9th Cir. 2001).  The plaintiff identifies a number of instances over the past five years which, it says, reflect a widespread practice of allowing

---

[9] This was also the situation discussed in *OSU Student Alliance v. Ray*, 699 F.3d 1053, 1063 (9th Cir. 2012), on which the plaintiff also relies.

open-ended student expressive activity within the Perimeter.  The Court considers these in turn.[10]

### i.  College of Engineering cookout.

In February 2014, the College of Engineering held a cookout in the Perimeter, complete with flag football, tug-of-war and a jousting ring.  (Doc. 103-8 at 2).  It is uncontroverted that these were "College of Engineering events," (Doc. 108-5 at 2; Doc. 108-6 at 66), and the plaintiff admits it was the University itself that used the Perimeter for the cookout.  (Doc. 101 at 13).

"When the government speaks, it is not barred by the Free Speech Clause from determining the content of what it says."  *Walker*, 135 S. Ct. at 2245.  There may be other constitutional or statutory limits on the government's ability to express itself, *id*. at 2246, and the First Amendment could be implicated if the government sought to compel private persons to convey its speech, *id*., but the plaintiff does not contend that any such possibility or provision is in play here.  Assuming without deciding that holding a cookout is expressive activity in any constitutionally meaningful sense, such expressive activity was that of the University itself and thus irrelevant to whether the University has opened the Perimeter to general student discourse.

### ii.  September 11 memorial.

In September 2011, the Department of Air Force Studies, the Department of Military Science, and Student Affairs hosted a commemorative ceremony at the flagpole in front of the administration building.  (Doc. 103-11 at 2).  It is uncontroverted that the hosts are all part of the University, and the plaintiff admits that the event constituted the University's own use of the Perimeter.  (Doc. 101 at

---

[10] Some of these episodes occurred before the Second Policy was adopted in August 2014.  Because the defendants do not argue that these more remote incidents are irrelevant to the inquiry, the Court considers them.

13).  As with the College of Engineering cookout, the flagpole ceremony
constituted the University's speech and so contributes nothing to the plaintiff's
argument that the University has by practice opened the Perimeter to general
student discourse.

### iii.  Signs advertising intramural sports.

The plaintiff states that banners advertising intramural sports have appeared
from time to time at a particular intersection within the Perimeter.  (Doc. 101 at
14).  It is uncontroverted that intramural sports are sponsored by the University
and that the signs advertising them were placed by the University.  (Doc. 99-6 at
4).  Since the signs constitute the University's own speech, they do not bolster the
plaintiff's case.

### iv.  Signs promoting tobacco-free campus.

The plaintiff submits pictures of yard signs within the Perimeter notifying
readers that the University "is going tobacco free August 1, 2015" and
encouraging them to "be Jag healthy!"  (Doc. 103-18).  It is uncontroverted that
these signs were placed by the University to promote the University's no-tobacco
policy.  (Doc. 99-1 at 16; Doc. 99-6 at 4).  Again, this is speech by the University
itself and so cannot indicate the University has generally opened the Perimeter to
student discourse.

### v.  ROTC training.

The plaintiff has submitted photographs of what it says are  "ROTC cadets
conduct[ing] military exercises" in the Perimeter.  (Doc. 101 at 14; Doc. 103-15).
The photographs confirm that the group was engaged in a training exercise, pure
and simple.

"We cannot accept the view that an apparently limitless variety of conduct
can be labeled 'speech' whenever the person engaging in the conduct intends

thereby to express an idea." *United States v. O'Brien*, 391 U.S. 367, 376 (1968). Even when the American flag – the "very purpose [of which] is to serve as a symbol of our country" – is involved, the Supreme Court does not "automatically conclud[e]" that the conduct is expressive. *Texas v. Johnson*, 491 U.S. 397, 405 (1989). "Instead, in characterizing such action for First Amendment purposes, we have considered the context in which it occurred." *Id*. And when "[t]he expressive component of … actions is not created by the conduct itself but by the speech that accompanies it[,] [t]he fact that such explanatory speech is necessary is strong evidence that the conduct at issue … is not so inherently expressive that it warrants protection under *O'Brien*." *Rumsfeld v. Forum for Academic and Institutional Rights, Inc*., 547 U.S. 47, 66 (2006).

The plaintiff offers no evidence that the cadets intended by their conduct to "express an idea" to begin with. Even had it done so, practicing military maneuvers is simply part of what ROTC cadets do, and in that context it carries no more inherent expressive content for purposes of First Amendment analysis than does a surgeon's wielding of a scalpel or a student's walking to class. Any expressive content would have to conveyed, as in *Rumsfeld*, by explanatory speech, and the plaintiff identifies none.

In short, the cadets' military exercise does not constitute expressive activity for First Amendment purposes and so is irrelevant to the plaintiff's effort to establish the Perimeter as a designated public forum for such purposes.

### vi. Homecoming campaign sign.

The plaintiff has evidence that, in October 2015, a "sheet sign" seeking support for a homecoming queen candidate hung for three days within the Perimeter before the candidate removed it. (Doc. 106-1 at 4-5, 7-8) It is uncontroverted that the candidate did not seek or obtain permission to hang the sign, and it is uncontroverted that defendant Mitchell, who is responsible for

implementing and enforcing the Second Policy, did not see the sign or know it was there.  (Doc. 111-1 at 3-4).

As noted, a designated public forum arises only when the government "intentionally open[s] a nontraditional forum for public discourse."  *Cornelius*, 473 U.S. at 802.  The plaintiff has not explained, and the Court cannot fathom, how a brief, unknown, unauthorized episode of expressive activity in violation of explicit policy could suggest in the slightest that a government has intentionally opened its property for public discourse.

### vii. Other cookouts.

The plaintiff has evidence that the Society of Women Engineers ("SWE"), a student organization, along with the College of Engineering, hosted a "welcome back cookout" in August 2013 and again in August 2015.  (Docs. 103-12, -13).[11] The plaintiff also has evidence that, in August 2014, Gulf Region Intelligent Transportation Systems ("GRITS"), another student organization, hosted a cookout that was co-sponsored by the College of Engineering.  (Doc. 103-14; Doc. 108-5 at 3).[12]

The plaintiff contends that, because SWE and GRITS co-sponsored these cookouts, their expressive content constitutes student speech.  Though unsupported by citation to authority, the assertion is plausible, and the defendants have done nothing to undermine it.  Instead, the defendants deny there was any expressive activity in connection with the cookouts, (Doc. 107 at 14, 21), but they

---

[11] The defendants have evidence that the College of Engineering organized the events, paid for the food, and supplied the grills, tables and tents.  (Doc. 108-5 at 2-3).

[12] The plaintiff does not deny that the University was a sponsor of these events. (Doc. 110 at 12).  While the defendants deny that SWE or GRITS co-sponsored the cookouts, (Doc. 107 at 8), the plaintiff's evidence creates a genuine issue of fact.  The defendants appear to believe that "hosting" and "sponsoring" an event are two materially different concepts, (Doc. 108-5 at 3), but without explanation – which they do not provide – the Court cannot indulge that assumption.

cite nothing that would compel such a conclusion.  The plaintiff identifies the message conveyed by these events as one of welcoming students and employees to campus, promoting the organizations, and soliciting new members, (Doc. 110 at 12), and the record excerpts it cites would support that construction.  For present purposes, the Court therefore assumes that the University has, once a year for three years, allowed a student engineering organization to promote itself and solicit new members at a cookout held within the Perimeter.

### viii.  Another September 11 memorial.

The plaintiff has evidence that, in September 2010, the Student Government Association ("SGA"), along with the Dean of Students' office and the Army/Air Force ROTC, "invite[d] the campus community to commemorate the events of September 11, 2001 by joining us for a brief ceremony" at the flagpole outside the administration building.  (Doc. 103-16).  Without any citation to the record, the defendants insist that this event was "University-sponsored [and] not student organization expressive activit[y]."  (Doc. 107 at 8).  In light of the plaintiff's evidence, the Court cannot indulge the defendants' *ipse dixit*.

### ix.  Relay for Life signs.

Finally, the plaintiff has evidence that, in March 2015, Colleges Against Cancer ("CAC"), a student organization, placed three yard signs within the Perimeter advertising its Relay for Life event, which signs remained in place until sometime in June 2015.  (Doc. 103-20; Doc. 103-25 at 4; Doc. 106-1 at 2).  The signs provide visual directions to the event and some sponsor (Walmart) information.  The most visible portions of the signs say, "Join us in the Fight Against Cancer," "RELAY FOR LIFE," "American Cancer Society," and "Celebrate. Remember. Fight Back."  (Doc. 103-20).

It is uncontroverted that CAC sought permission to place small directional signs to the event when there was a late change in its on-campus venue; that

Rachael Bolden in the Office of Student Activities granted permission but under the assumption they would not be placed in the Perimeter; that she later saw one of the signs in the Perimeter but did not seek to have it removed because it was a short time before the event and because its purpose was to direct participants to the event; that she did not realize the signs remained in place long after the March 20 event; that the ordinary practice is for event-related signs anywhere on campus to be removed by event organizers upon the conclusion of the event, failing which the University grounds department is to remove them; and that no one was ever warned or sanctioned for placing the signs in the Perimeter.  (Doc. 104-24 at 2; Doc. 106-2 at 3; Doc. 108-10 at 3; Doc. 111-2 at 3).

Contrary to the defendants' suggestion, this evidence does not prove that the signs "went undetected by University officials." (Doc. 111 at 11).  That Bolden did not notice the signs' continued presence cannot demonstrate that Mitchell and other University officials did not notice; indeed, the long time the signs remained in place (between two and three months), with at least two of them on a major artery into campus, of itself supports an inference that the University knew the signs were there.

**x.  Summary and analysis.**

The plaintiff has evidence of the following relevant student speech or expressive activity in the Perimeter:  (1) co-sponsorship by the SGA of a 9-11 commemorative ceremony in 2010; (2) co-sponsorship by two engineering organizations of three welcome-back cookouts, one each in 2013, 2014 and 2015; and (3) placement of several yard signs advertising an anti-cancer event in March-June 2015.  The question becomes whether these episodes indicate that the University has generally opened the Perimeter to student discourse.

As noted, "[t]he government does not create a public forum … by permitting limited discourse," *Cornelius*, 473 U.S. at 802, and "[a] designated public forum is not created when the government allows selective access for

individual speakers rather than general access for a class of speakers." *Forbes*, 523 U.S. at 679.  At best, the plaintiff can identify only five occurrences of student speech in the Perimeter in as many years, an infrequency that does not suggest the University has purposefully opened that area to "indiscriminate use" as a public forum.

Nor does the subject matter of these isolated occurrences suggest the University has opened the Perimeter to general student discourse (designated public forum) as opposed to "the discussion of certain subjects" (limited public forum).  *Summum*, 555 U.S. at 470; *accord Walker*, 135 S. Ct. at 2250.  Three of the five instances were mere social gatherings of engineering students seeking to bond with professors and other engineering students, and the other two addressed eminently non-controversial topics.[13]  It is uncontroverted that the University's restriction on speech in the Perimeter is based in part on a desire to avoid being perceived by the Mobile community (which the Perimeter faces) as taking sides on any controversial political or social issue,[14] and the plaintiff has no evidence that the University has ever permitted student speech in the Perimeter on any controversial matter of any kind.[15]  Without such evidence, the most the plaintiff can show is that by practice the University has opened the Perimeter only to the "discussion of certain [i.e., non-controversial] subjects."  Since the government can (if it honors viewpoint neutrality) restrict speech in order to avoid controversy

---

[13] The plaintiff has not suggested the existence of a vigorous pro-cancer lobby. And while the root causes of, and blame for, the September 11 attacks may provoke disagreement, the tragedy of the lives lost that day does not.  The 2011 flagpole event was limited to "remember[ing] and honor[ing] the lives lost … on 9/11," (Doc. 103-11 at 2), and the plaintiff has identified no evidence that the 2010 event had a different focus.

[14] (Doc. 98 at 14; Doc. 99-5 at 27-28; Doc. 99-8 at 30-32; Doc. 99-9 at 71-72). As discussed in Part I.A.3.a.iii, *infra*, the plaintiff's only efforts to draw this evidence into question fail to do so.

[15] Even could the 2010 commemoration of 9-11 be considered controversial, the plaintiff's own authority confirms that "[o]ne or more instances of erratic enforcement of a policy does not itself defeat the government's intent not to create a public forum." *Ridley v. Massachusetts Bay Transportation Authority*, 390 F.3d 65, 78 (1st Cir. 2004).

in a limited public forum but not in a designated public forum, *Cornelius*, 473 U.S. at 811, the University's desire to avoid controversial speech in the Perimeter, and the plaintiff's inability to produce evidence the University has permitted controversial speech there, demonstrate that it has not by practice evinced an intent to open the Perimeter to general student discourse.

In *United States v. Kokinda*, 497 U.S. 720 (1990), "individuals or groups ha[d] been permitted to leaflet, speak, and picket on postal premises, … but a regulation prohibiting disruption … and a practice of allowing some speech activities on postal property do not add up to the dedication of postal property to speech activities." *Id.* at 730 (plurality opinion).  This history reflected only "selective access," which "does not transform government property into a public forum." *Id.* (internal quotes omitted).  Thus, the postal premises remained a limited public forum, and the government's ban on solicitation on postal premises was reviewable only for reasonableness. *Id.*

*Kokinda* thus establishes that a practice of permitting some controversial speech (picketing almost by definition involves a controversial issue) is insufficient to reflect that the government has opened the forum to other controversial speech (solicitation, which would include solicitation for controversial causes).  Here, the plaintiff has not even shown a practice of permitting some forms of controversial speech in the Perimeter, so its case is weaker than that ruled legally inadequate in *Kokinda*.  Certainly the plaintiff has not attempted to explain how its position (that a few, infrequent instances of bland student speech on non-controversial matters demonstrates the University purposely opened the Perimeter to unlimited student speech on any and all matters) can be reconciled with *Kokinda*.[16]

---

[16] While it is a four-Justice plurality opinion, the Eleventh Circuit has employed this portion of *Kokinda* without reservation. *Sentinel Communications Co. v. Watts*, 936 F.2d 1189, 1204 (11th Cir. 1991).  The *Bloedorn* Court also relied on *Kokinda* for the proposition that "[i]t is immaterial that, inevitably, some expressive conduct may occur in

In short, while the University's practice may suggest an intent to permit the discussion of certain subjects, such an intent reflects only a limited public forum; the University's practice does not support a reasonable inference that the University intended to create a designated public forum by opening the Perimeter to general student discourse.

### c.  Nature of the property.

The plaintiff identifies three ways in which the nature of the Perimeter suggests it is a designated public forum:  (1) it is part of a college campus; (2) it resembles a public park (a traditional public forum), with expansive lawns, sidewalks and picnic benches; and (3) its outer border is a public sidewalk – a traditional public forum – with no physical barrier between the two.  (Doc. 101 at 26-27).

As the plaintiff acknowledges, "[t]he physical characteristics of the property alone cannot dictate forum analysis."  *Bloedorn*, 631 F.3d at 1233.  As the plaintiff does not acknowledge, the nature of the property is relevant only to the extent it helps "discern the government's intent" to create a designated public forum.  *Cornelius*, 473 U.S. at 802; *accord Sentinel Communications Co. v. Watts*, 936 F.2d 1189, 1202 (11th Cir. 1991) ("[T]he touchstone for determining whether property is a designated public forum is government intent in establishing and maintaining the property," with the nature of the property relevant "[i]n attempting to divine whether the government has intended to designate" a public forum).

The Supreme Court in *Cornelius* cited only two cases as reflecting its historical consideration of the nature of the property in its investigation of the government's intent.  In *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546 (1975), the municipal auditorium and theater "were designed for and dedicated to expressive activities," 473 U.S. at 803; the plaintiff has shown neither regarding

the forum."  631 F.3d at 1233.  The Court has been given no reason to believe *Kokinda* does not accurately represent the state of governing law.

the Perimeter.  In *Widmar v. Vincent*, 454 U.S. 263 (1981), the university's policy "evidenced a clear intent to create a public forum," with that clear intent merely corroborated by the observation that "a university campus, at least as to its students, possesses many of the characteristics of a traditional public forum."  473 U.S. at 802-03.  Here, as discussed in Parts I.A.2.a-b, the University's policy evidences a clear intent *not* to create a public forum, and its practice evidences at most an intent to permit limited discourse (i.e., a limited public forum).  The plaintiff does not invoke the nature of the Perimeter to bolster a showing of intent to create a designated public forum as reflected by policy and/or practice, but to compensate for the complete absence of such a showing.  In effect, the plaintiff argues that, because the nature of the Perimeter would make it a plausible public forum, the University must have intended to designate it a public forum despite University policy and practice to the contrary.  Since, as the plaintiff concedes, the nature of the property cannot alone determine the nature of the forum, *Bloedorn*, 631 F.3d at 1233, its position is untenable.[17]

Even disregarding the inherent futility of its effort, the plaintiff has not shown that the nature of the Perimeter indicates the University intended to designate it as a public forum.  The plaintiff first proposes that "the free expression of diverse viewpoints is part and parcel of the higher learning for which" a university campus is created.  (Doc. 101 at 26).  No doubt, but this hardly suggests that every square inch of a campus is or ought to be a designated public forum for student speech.  The plaintiff itself quotes *Bloedorn* for the proposition that "[a] university campus will surely contain a wide variety of fora on its grounds," 631 F.3d at 1232, so it is both unnecessary and unlikely that an

---

[17] The plaintiff similarly concedes that policy and practice (or "traditional use") is "the most significant factor" in the analysis, (Doc. 106 at 26), signifying its recognition that the nature of the property (and its compatibility with expressive activity) cannot trump clear policy and practice.

entire campus will be a designated public forum.[18]  Because the Second Policy renders much of the campus a designated public forum,[19] it is plain the plaintiff's choice is not between speaking in the Perimeter or not speaking at all.

As for the Perimeter's "park-like" feel, the plaintiff in *Sentinel* argued that interstate rest areas were designated public fora because their "topographical features … frequently resemble those found in city parks, *e.g.* grassy areas, restrooms, water fountains, parking areas, picnic benches."  936 F.2d at 1203-04.  The Eleventh Circuit rejected the contention, noting that a property's physical characteristics cannot alone render it a designated public forum and further noting evidence that the government intended these features to promote traveler rest and thus traveler safety.  *Id*. at 1204 & n.15.  Here, it is uncontroverted that the University has expended substantial sums on the Perimeter for the purpose of making it aesthetically pleasing to the campus community, to the broader community, and to prospective students and their parents.  (Doc. 98 at 14; Doc. 99-8 at 28-29; Doc. 99-9 at 68-69).[20]  As in *Sentinel*, the Perimeter's park-like features were developed, not to promote First Amendment activity, but to serve

_____

[18] As the *Bloedorn* Court also noted, "the fact that a University may make a discrete location on a sprawling campus available for public discourse does not compel the conclusion that it must open the doors of all of its facilities for public discourse."  631 F.3d at 1230.

[19] "[A]ll areas of the University campus are open for expressive activities except" the Perimeter, areas within 100 feet of academic and residential buildings, the basketball arena and its grounds, Moulton Tower, Alumni Plaza, and the University's hospitals, clinics and associated grounds.  (Doc. 29-10 at 3-4).  It is not clear how much space is encompassed within these areas, but the plaintiff admits the campus contains approximately 1,224 acres, (Doc. 29 at 9), or almost two square miles, and the excluded areas clearly comprise only a fraction of this expanse.  The plaintiff admits that the Second Policy "allows students to speak in many areas of the campus."  (*Id*. at 20).

[20] The plaintiff questions whether protecting the aesthetics of the Perimeter is a valid reason for prohibiting student speech there, but it has raised no challenge to the defendants' evidence that aesthetics drove the development of the Perimeter's park-like features.

other interests, and they therefore do not suggest an intent to open the Perimeter to general student discourse.

Finally, the plaintiff finds it "[a]bsur[d]" to imagine that students have full First Amendment protection while standing on the traditional public forum of the public sidewalk bordering campus "but lose it all" by taking a single step from that sidewalk into the Perimeter.  (Doc. 106 at 28).  It can hardly be an absurdity, however, that fora have geographical boundaries or that different kinds of fora may abut.  Neither the Supreme Court nor the Eleventh Circuit shares the plaintiff's incredulity regarding the commonplace of adjoining government properties constituting different fora for First Amendment purposes.  *See Kokinda*, 497 U.S. at 723, 730 (public sidewalk was traditional public forum, but sidewalk on adjoining post office property was limited public forum); *United States v. Gilbert*, 130 F.3d 1458, 1460-61 (11th Cir. 1997) (courthouse plaza was a designated public forum on one side of a row of planters and a non-public forum on the other).

### d.  Compatibility with expressive activity.

The plaintiff cites a Fifth Circuit case for the proposition that "a university campus is clearly an appropriate place for communication of views on issues of political and social significance."  *Justice for All v. Faulkner*, 410 F.3d 760, 769 (5th Cir. 2005) (internal quotes omitted).  The plaintiff also points to the speech discussed in Parts I.A.2.b.i-ix, as reflecting the compatibility of the Perimeter with expressive activity.  (Doc. 101 at 19).  The defendants argue this historical speech is irrelevant to the compatibility analysis because it "was only conducted by the University and its departments."  (Doc. 107 at 18).  As discussed in Part I.A.2.b, some of this speech was in fact student speech, but it would seem the compatibility of a forum with some student speech does not necessarily reflect its compatibility with all forms of student speech.  Nevertheless, the Court will

assume without deciding that the Perimeter may be compatible with student speech in general, including speech on controversial political and social issues.

### e.  Summary and analysis.

The question is whether the plaintiff's evidence either establishes that the Perimeter is a designated public forum or at least creates a genuine issue of material fact in that regard.  The Perimeter cannot be a designated public forum unless the University purposefully and intentionally opened the Perimeter to general student discourse.  The University's intent is determined by evaluating its policy concerning student speech in the Perimeter, its practice concerning student speech in the Perimeter, the nature of the Perimeter, and the Perimeter's compatibility with general student discourse therein.

The Second Policy expressly closes the Perimeter to general student discourse.  The University in practice has on rare occasions permitted limited student discourse within the Perimeter on certain academic subjects and non-controversial social subjects but has never authorized student expressive activity there on any divisive social or political issue.  The Perimeter may be compatible with such speech, but its nature does not indicate that the University intended to make it a designated public forum, especially given that the University has expressly made other portions of campus designated public fora and that it had other reasons for establishing the Perimeter.

Where, as here, the uncontroverted facts reflect that the government's policy and practice are patently inconsistent with an intent to establish a designated public forum, the mere compatibility of the property with expressive activity, and its mere similitude with such fora, cannot demonstrate that the government intended to create such a forum.  The Perimeter thus is not a designated public forum but is at best a limited public forum.[21]

---

[21]  The plaintiff insists that "[e]very other court to examine the question has ruled that the generally accessible, outdoor areas of a public university campus represent a

### 3. Limited public forum.

"Control over access to a nonpublic [limited public] forum can be based on subject matter and speaker identity so long as the distinctions drawn are reasonable in light of the purpose served by the forum and are viewpoint neutral."

---

designated public forum for its students." (Doc. 101 at 24 n.7). The Court has performed no independent, exhaustive search, but it has reviewed the cases cited by the plaintiff, none of which involve a policy and practice of not opening such areas (or a portion of them) to general student discourse. On the contrary, all three appellate cases the plaintiff cites found a designated public forum based on written government policy affirmatively opening the forum to student expression. *See OSU Student Alliance*, 699 F.3d at 1063 ("Through this rule, the state has intentionally dedicated campus property to expressive conduct, thereby creating a designated public forum.") (internal quotes omitted); *Justice For All*, 410 F.3d at 769 ("The Institutional Rules … clearly evince an intent to maintain the Austin campus as a designated forum for student expression …. In sum, we hold that the University, through its own policies, has designated the outdoor open areas of its campus generally accessible to students – such as plazas and sidewalks – as public forums for student speech."); *Hays County Guardian*, 969 F.2d at 116 ("The clear implication of the Operating Letter is that the University intends its outdoor grounds to be a forum for student distribution of literature."). Several of the trial court decisions the plaintiff cites were decided on similar grounds. Only one or two arguably ruled parts of campus a designated public forum without finding support in policy and/or practice, and they are so plainly at war with the analysis dictated by *Cornelius* that they cannot entice the Court to follow them.

Equally puzzling – and unavailing – is the plaintiff's insistence that *Bloedorn* itself establishes that "the open, outdoor areas of campus represent … a designated public forum for students." (Doc. 110 at 15). The plaintiff does not suggest the Eleventh Circuit made any such pronouncement, and it could scarcely have so held, given that the plaintiff in *Bloedorn* was not a student but a campus outsider. It is difficult to believe the panel even harbored a suspicion that outdoor campus areas automatically constitute designated public fora for student expression, given its recognition that "a school creates a designated public forum *only* when school authorities have *by policy or practice* opened those facilities for indiscriminate use by the general public." 631 F.3d at 1231 (internal quotes omitted, emphasis added). Ignoring these difficulties, the plaintiff argues that, by citing a Fourth Circuit case which may suggest that a college campus is a designated public forum for students, the *Bloedorn* Court adopted this proposition as Eleventh Circuit law. It is far from clear that *American Civil Liberties Union v. Mote*, 423 F.3d 438 (4th Cir. 2005), supports the proposition the plaintiff attributes it to it. In any event, controlling precedent is not established so casually. The *Bloedorn* panel merely cited *Mote* without comment and only in support of its holding that various outdoor areas of Georgia Southern University were limited (not designated) public fora. 631 F.3d at 1232.

*Cornelius*, 473 U.S. at 806; *accord Perry*, 460 U.S. at 49.  This proposition is
"black-letter law."  *Davenport v. Washington Education Association*, 551 U.S.
177, 189 (2007).  The plaintiff acknowledges this is the standard applicable to
limited public fora, (Doc. 101 at 23 n.6; Doc. 106 at 20, 29), but argues the
restrictions on student speech in the Perimeter fail both prongs.[22]

### a. Reasonableness.

"The Government's decision to restrict access to a nonpublic [limited
public] forum need only be *reasonable*; it need not be the most reasonable or the
only reasonable limitation.  In contrast to a public forum, a finding of strict
incompatibility between the nature of the speech … and the functioning of the
nonpublic [limited public] forum is not mandated."  *Cornelius*, 473 U.S. at 808
(emphasis in original).  "The reasonableness of the Government's restriction of
access to a nonpublic [limited public] forum must be assessed in the light of the
purpose of the forum and all the surrounding circumstances."  *Id*. at 809.

The plaintiff's arguments against reasonableness take several forms:  (1)
the University has no legitimate interest at stake; (2) the University's interest is
not at risk; (3) the University did not genuinely act for the purpose of avoiding

---

[22] The defendants insist that the plaintiff "may not now argue that the Second
Policy is unreasonable or discriminates on the basis of viewpoint," on the grounds that
the plaintiff "has never alleged, including in its prior briefing, any facts demonstrating
that the Second Policy is unreasonable or discriminates on the basis of viewpoint."  (Doc.
98 at 26).  The amended complaint, however, explicitly alleges that the Second Policy is
an unreasonable restriction on speech and that it grants the defendants unbridled
discretion to engage in viewpoint discrimination.  (Doc. 29 at 27-28, 30).  The plaintiff
thus is not improperly "amending its complaint through argument at the summary
judgment phase," as the defendants wrongly claim.  (Doc. 98 at 26).  To the extent the
defendants suggest the plaintiff was required to plead additional facts in support of these
allegations, the amended complaint contains far more than enough factual material to
render the assertions of unreasonableness and viewpoint discrimination plausible under
*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007).  To the extent they suggest the
plaintiff was required to assert such facts in support of its motion for preliminary
injunction, or in opposition to their motion to dismiss, they have cited no authority for the
facially improbable proposition that a party is barred from presenting facts in support of
one motion that it failed to present on a previous motion.

such a risk; and (4) the University's response does not adequately correspond to the risk.  The Court addresses these in turn.

### i. Legitimate interest.

The University advances several justifications for restricting student speech in the Perimeter:  (1) maintaining a visually attractive campus periphery; (2) promoting traffic safety; (3) promoting its image as an educational institution in the community; and (4) maintaining an apolitical or neutral viewpoint and avoiding the appearance of favoring or endorsing a particular viewpoint.  (Doc. 107 at 24; Doc. 111 at 12-13).  Because it is dispositive, the Court focuses on the last of these.[23]

The defendant has presented evidence of its interest in avoiding the public appearance of endorsement or partiality on divisive political and social issues.  (Doc. 98 at 14; Doc. 99-5 at 27-28; Doc. 99-8 at 30-32; Doc. 99-9 at 71-72).  "[A]voiding the appearance of political favoritism is a valid justification for limiting speech in a nonpublic forum."  *Cornelius*, 473 U.S. at 809.  The plaintiff asserts that *Cornelius* is inapposite because it involves "a very different forum."  (Doc. 110 at 20).  Both the exceptionless phrasing of the Supreme Court's pronouncement and the wide range of settings in which the principle has been applied,[24] however, confirm that it extends to the Perimeter.

---

[23] The plaintiff, (Doc. 101 at 31), complains that "[l]isteners' reaction to speech is not a content-neutral basis for regulation."  *Forsyth County v. Nationalist Movement*, 505 U.S. 123, 134 (1992).  Fine, but "content discrimination … may be permissible if it preserves the purposes of that limited forum," *Rosenberger*, 515 U.S. at 829, which is the issue addressed in text and resolved favorably to the defendants.  Subject-matter discrimination is not merely permissible in a limited public forum but "inherent and inescapable in the process of limiting a nonpublic [limited public] forum to activities compatible with the intended purpose of the property."  *Perry*, 460 U.S. at 49.   Indeed, the plaintiff concedes that "[r]estrictions on speech in limited public forums need only be reasonable and viewpoint neutral," not content neutral.  (Doc. 41 at 26 n.9).

[24] *See Cornelius*, 473 U.S. at 791 (charitable fund-raising drive in the federal workplace); *Del Gallo v. Parent*, 557 F.3d 58, 62, 73 (1st Cir. 2009) (campaigning for

Undeterred, the plaintiff says that, "on public university campuses throughout this country, … free speech is of critical importance because it is the lifeblood of academic freedom." *DeJohn v. Temple University*, 537 F.3d 301, 314 (3rd Cir. 2008). Therefore, the plaintiff concludes, the University can have no legitimate interest in restricting student speech in order to maintain a perception of neutrality in the public eye. (Doc. 106 at 31). The defendants, however, have presented evidence that the concept of university neutrality as a means of promoting the open discussion of ideas dates to Renaissance Europe and "has been strongly endorsed by American universities." (Doc. 99-8 at 30-31). The plaintiff has neither countered this evidence nor attempted to explain away the facial plausibility of its premise that the free exchange of ideas is enhanced when the government does not place its imprimatur on one set of ideas. *See Coalition for the Abolition of Marijuana Prohibition v. City of Atlanta*, 219 F.3d 1301, 1318 (11th Cir. 2000) (" *CAMP*") (even in the context of a traditional public forum, "[t]o demonstrate the significance of its interest, the [defendant] is not required to present detailed evidence but is entitled to advance its interests by arguments based on appeals to common sense and logic.") (internal quotes omitted).

In short, maintaining the appearance of neutrality on divisive political issues is a legitimate University interest. Since the plaintiff has not even suggested that what is true about avoiding the appearance of favoritism on political issues is any less true with respect to social issues (to the doubtful extent any significant social issue could fail in a democracy to be also a political issue), the University's interest extends there as well.

---

election on post office property); *Preminger v. Principi*, 422 F.3d 815, 819, 825 (9th Cir. 2005) (voter registration drive for veterans at VA facility); *Berner v. Delahanty*, 129 F.3d 20, 22, 26-27 (1st Cir. 1997) (lawyer wearing political button in courtroom). In support of the quoted proposition, moreover, the *Cornelius* Court relied on *Lehman v. City of Shaker Heights*, 418 U.S. 298 (1974), which held that a municipality that sold advertising space on its rapid transit system could appropriately refuse to accept "political or public issue advertising" in order to avoid, inter alia, "the appearance of favoritism." *Id*. at 301, 304 (plurality opinion).

### ii.  Risk to legitimate interest.

The plaintiff is probably correct that preventing speech on divisive issues in order to avoid the appearance of endorsement of, or partiality towards, a particular viewpoint may be unreasonable if there is no realistic danger of such an appearance.  (Doc. 106 at 32).  But the plaintiff has failed to explain how such a danger is absent here.  The only free speech case on which it relies involved employee postings on "[t]he interior walls [and bulletin boards] of the offices" of a state agency, places the public never visited.  *Tucker v. Department of Education*, 97 F.3d 1204, 1214-15 (9th Cir. 1996).  And while it may be that "[r]easonable persons are not likely to consider all of the information posted on bulletin boards or walls in government buildings to be government-sponsored or endorsed," *id*. at 1215, this case does not involve such quiet, hidden speech.  Instead, it involves outdoor speech in the University's front yard, the area most readily associated with the University by the general public and the area most exposed to direct observation by the general public.[25]

The *Tucker* Court acknowledged, 97 F.3d at 1215, that a risk of perceived endorsement existed in *Monterey County Democratic Central Committee v. United States Postal Service*, 812 F.2d 1194 (9th Cir. 1987), where a partisan organization sought to register voters on a post office sidewalk – the facility's front yard.  *Id*. at 1195, 1199.  Just so here, the passing public could easily understand that student speech in the Perimeter on a controversial issue was endorsed or at least approved by the University, thereby stripping the University of its aura of neutrality.[26]

---

[25] Indeed, this is precisely why the plaintiff wants to speak there – so it can most effectively reach the non-campus community.  (Doc. 29 at 14, 16, 24).

[26] The plaintiff also cites *Knights of the Ku Klux Klan v. East Baton Rouge Parish School Board*, 578 F.2d 1122 (5th Cir. 1978), but that case did not involve the reasonableness of a restriction on speech in a limited public forum, and it did not address public perception of the government's endorsement or approval of private speech. Instead, the case involved a viewpoint-based exclusion of a particular speaker from a

After briefing on the instant motion was concluded, the Eleventh Circuit noted in a free speech case that "government property is often closely identified in the public mind with the government unit that owns the land." *Mech v. School Board*, 806 F.3d 1070, 1076 (11th Cir. 2015) (internal quotes omitted). The *Mech* Court found such a potential association where the speech at issue was hung on school fences, and it used this association as part of its rationale for concluding that "observers reasonably believe the government has endorsed the message." *Id*. *Mech* further supports the proposition that the University could reasonably believe that authorizing student speech in the Perimeter concerning divisive issues risked public perception that it endorsed or approved of the viewpoints there expressed.

Its free speech jurisprudence exhausted, the plaintiff turns to the Establishment Clause. (Doc. 101 at 33; Doc. 110 at 20). "We think that secondary school students are mature enough and are likely to understand that a school does not endorse or support student speech that it merely permits on a nondiscriminatory basis." *Board of Education v. Mergens ex rel. Mergens*, 496 U.S. 226, 250 (1990) (plurality opinion). The plaintiff assumes that this proposition can be imported wholesale into the free speech context and applied to the citizenry at large. The Court is not so sanguine.

First, the Establishment Clause prohibits the government from endorsing religion, and high school students exposed to civics classes can be expected to realize this; thus, they are unlikely to assume that the school has endorsed student religious speech, contrary to the Constitution. But, at least in general, nothing prevents the University from lawfully endorsing a viewpoint expressed on a subject of political or social significance, so students' expression of such views cannot so easily be assumed to lack the University's approval.

---

designated public forum, and it addressed the government's actual and legal relationship to the speaker's speech, not the public's perception of that relationship. *Id*. at 1124-25, 1127-28.

Second, the relevant audience in *Mergens* was a student body freshly conversant with First Amendment concepts.  Here, in contrast, the relevant audience is the general public passing by the University campus.  While this group will include persons with a similar understanding of the relevant concepts, it will also include persons never adequately exposed to them and those whose grasp of them has faded.[27]

In *Rosenberger v. Rector and Visitors of the University of Virginia*, 515 U.S. 819 (1995), the other Supreme Court Establishment Clause case cited by the plaintiff, the Court ruled that the defendant's concern that a speaker's religious orientation might be attributed to the defendant was "not plausible" where the defendant "has taken pains to disassociate itself from the private speech involved in this case."  *Id*. at 841.  This focus on the defendant's efforts to distance itself from the speaker seems hardly to support the proposition that students or even adults can be assumed not to confuse private religious speech with government speech or endorsement.

The plaintiff offers no case employing *Mergens* or its rationale in the free speech context or to an audience consisting of the general public.  For the reasons stated above, the Court concludes that it does not apply to the present case.

### iii. Motivation for response.

The plaintiff assumes rather than establishes that the government must have acted specifically for the purpose of protecting or advancing the legitimate interest it claims.  Without adopting that assumption, the Court indulges it for present purposes.  As noted in Part I.A.2.b.x, the defendants have presented evidence that the University's restriction on student speech in the Perimeter is based in part on its desire to avoid the appearance of endorsing or approving of any particular viewpoint on any controversial political or social issue.

---

[27] Media reports concerning the unfamiliarity of many American adults with even the most basic First Amendment concepts appear with dismaying frequency.

The plaintiff unpersuasively suggests the University does not truly care about fostering a public perception of neutrality because "[p]ublic universities often take controversial positions" in litigation.  (Doc. 101 at 33 & n.12).   But universities, like every individual and like all other artificial entities, have interests – and thus opinions – with which others may disagree, and they can scarcely be expected to remain publicly neutral on issues affecting their interests.  Under the plaintiff's reasoning, an umpire could not credibly claim to care about the appearance of impartiality in officiating if he publicly expressed opinions on zoning issues in his neighborhood.

In a related vein, the plaintiff argues the University does not really value a public perception of its neutrality on divisive political and social issues because the Perimeter does not extend to the entirety of the campus's border with the community.  (Doc. 101 at 33-34).  The western reach of the Perimeter ends at Stadium Drive, (Doc. 29-10 at 3), which leaves students free to engage in expressive activity along Old Shell Road immediately west of Stadium Drive, in front of the student recreation center.  Similarly, the northern reach of the Perimeter ends at USA North Drive, though the campus continues north of that point.  The defendants acknowledge that student speech west of Stadium Drive and north of USA North Drive could be publicly perceived as endorsed or approved by the University, but they say the risk is lower in these locations. (Doc. 104-4 at 53, 55-56; Doc. 104-5 at 45).  The Court agrees with that assessment.  Speech between the rec center and Old Shell Road occurs on the western fringe of campus, by a specifically student building and far from the academic, administrative and athletic structures east of Stadium Drive.  Speech north of USA North Drive occurs in an undeveloped and largely wooded area, likewise separated from the heart of campus.  The exclusion of these areas from the Perimeter does not support a reasonable inference that the University does not genuinely care about sustaining a public perception of its neutrality.

### iv.  Correlation between risk and response.

In a traditional or designated public forum, the restriction on speech must be "narrowly tailored" to serve a significant government interest, which requires a "reasonable fit" between means and ends.  *CAMP*, 219 F.3d at 1316, 1318.  The plaintiff proposes that this "reasonable fit" standard be applied in the context of a limited public forum, for the purpose of showing that the restriction on student speech in the Perimeter is unreasonably under-inclusive (since it excludes the border area west of Stadium Drive).  (Doc. 101 at 32-33).  But the very point of forum analysis is to ensure that more lenient standards prevail when considering limited public fora.  As the Ninth Circuit has said, "[r]easonableness is not the legal equivalent of narrow tailoring …."  *Flint v. Dennison*, 488 F.3d 816, 834-35 (9th Cir. 2007).  At any rate, the purpose of the "reasonable fit" analysis is to ensure that speech restrictions do not sweep overbroadly, *CAMP* at 1318, not – as the plaintiff seeks to employ it – to show that a restriction does not extend far enough.  Even if, as the plaintiff asserts, a speech restriction is unreasonable when "the fit between means and ends is loose or nonexistent," (Doc. 106 at 25), that is a far lower standard than "narrow tailoring," and it is one the Second Policy easily hurdles.[28]

The plaintiff, (Doc. 106 at 35), acknowledges that "[t]he government need not choose the least restrictive alternative when regulating speech in a nonpublic forum."  *Tucker*, 97 F.3d at 1216.  But, it says, the government's "failure to select … simple available alternatives suggests that the ban it has enacted is not reasonable."  *Id*. (internal quotes omitted).  The plaintiff believes the University

---

[28] The plaintiff argues the Second Policy is even more unreasonably under-inclusive because it fails to preclude student speech in the interior of campus.  (Doc. 106 at 33 & n.17).  The plaintiff thus finds itself in the curious position of insisting that the University should have more thoroughly restricted student speech.  But it was plainly reasonable for the University to balance student speech against its interest in an appearance of neutrality differently in the interior than in the campus border with the outside community, where the public exposure enhances the risk of public misperception that the University endorses or approves the viewpoints expressed there.

could have protected its interest in the public perception of its neutrality by "an equal access policy," by "signs identifying the speaker," and/or by the Second Policy's statement that it (the policy) does not represent the University's endorsement or approval of any speech. (Doc. 106 at 35).

The plaintiff does not explain how its proposals would address the risk of a public perception of University partiality. Take the plaintiff's situation as an example. If the plaintiff held a cemetery-of-innocents event at the corner of Old Shell Road and University Boulevard, how would the average citizen passing by the display know (or remember) that the University would, if asked, allow a pro-choice student group to stage a similar event, and what is the likelihood he or she would reflect on that bit of fuzzy memory and extrapolate that the University thus does not endorse the plaintiff's message? A sign identifying the plaintiff would do nothing to dispel the risk, because the risk is not that the public would believe the University is speaking but that it would believe the University endorses or approves the speaker's message, delivered from the University's front yard. And certainly the average citizen is not privy to the Second Policy, which is but an internal document – one that in any event only denies endorsement or approval flowing from the policy itself.

Finally, the plaintiff characterizes the Second Policy as imposing a "complete ban on First Amendment activities" that is per se unconstitutional even in a limited public forum under *Board of Airport Commissioners v. Jews for Jesus, Inc*., 482 U.S. 569 (1987). (Doc. 106 at 30; Doc. 110 at 19). The policy at issue in *Jews for Jesus*, however, extended to the entire "Central Terminal Area" of Los Angeles International Airport, *id*. at 570-71 – a vast area encompassing most locations where the non-employee public might be found. Here, in contrast, the Perimeter takes in only part of the southern and eastern borders of campus, leaving large amounts of the campus beyond its reach. The plaintiff cites no authority for the proposition that a government is powerless to preclude First Amendment expression in any sliver of its property.

34

At any rate, the plaintiff's own evidence proves there is in fact no "complete ban on First Amendment activities" on the perimeter of campus, since the perimeter west of Stadium Drive and north of USA North Drive remains fully open for that purpose. Even in the Perimeter itself, some student speech occurs. In addition to the student speech discussed in Part I.A.2.b, the plaintiff acknowledges that speech such as game-related signs at a pick-up football game in the Perimeter is permitted. (Doc. 101 at 23). The ban in *Jews for Jesus*, in contrast, was truly complete because it extended even to "talking and reading." 482 U.S. at 575.

Having disposed of the plaintiff's arguments, the Court turns to a "surrounding circumstance" that reinforces the reasonableness of the University's decision to close the Perimeter to student speech. "[W]hen access barriers are viewpoint neutral, our decisions have counted it significant that other available avenues for the group to exercise its First Amendment rights lessen the burden created by those barriers." *Christian Legal Society v. Martinez*, 561 U.S. 661, 690 (2010). Thus, "the reasonableness of the limitations on [the plaintiff's] access to the school mail system is also supported by the substantial alternative channels that remain open for union-teacher communication to take place," resulting in "no showing here that [the plaintiff's] ability to communicate with teachers is seriously impinged by the restricted access to the internal mail system." *Perry*, 460 U.S. at 53.

Barring student speech in the Perimeter plainly leaves students and student groups "substantial alternative channels" for reaching their target audience. To the extent the target audience is the campus community, large portions of the interior of campus constitute designated public fora for students, including along the University's major roadways. To the extent the target audience is the outside community, the area along Old Shell Road west of Stadium Drive, and the area along University Boulevard north of USA North Drive, remain designated public

fora as well.[29]  And of course the public sidewalk all along Old Shell Road and University Boulevard is a traditional public forum.[30]  The plaintiff prefers to speak in the Perimeter, especially at the highly visible corner of Old Shell and University, but "[t]he First Amendment does not demand unrestricted access to a nonpublic forum merely because use of that forum may be the most efficient means of delivering the speaker's message." *Cornelius*, 473 U.S. at 809.[31]

In summary, the University's restriction of student speech in the Perimeter is reasonable in light of the purpose of the Perimeter and the surrounding circumstances.

### b.  Viewpoint Neutrality.

"The existence of reasonable grounds for limiting access to a nonpublic [limited public] forum, however, will not save a regulation that is in reality a façade for viewpoint-based discrimination." *Cornelius*, 473 U.S. at 811. "Although a speaker may be excluded from a nonpublic [limited public] forum if he wishes to address a topic not encompassed within the purpose of the forum, …

---

[29] The plaintiff's suggestion that, since the University will allow speech in these areas – located along major thoroughfares and directly adjacent to the Perimeter the plaintiff is desperate to use – they must be "too remote" to be effective, (Doc. 101 at 38), does not pass its own "laugh test."  (*Id*. at 9).

[30] The plaintiff sniffs that the availability of the public sidewalk is irrelevant because it is not the University's property.  (Doc. 106 at 36).  The Court must disagree. "[I]t is a mark of favor of the statute's reasonableness that the barred activity can be undertaken in an adjacent forum – the sidewalk running along" the border of the Supreme Court property.  *Hodge v. Talkin*, 799 F.3d 1145, 1169 (D.C. Cir. 2015), *petition for cert. filed*, 84 U.S.L.W. 3388 (U.S. Jan. 4, 2016).

[31] The plaintiff, (Doc. 106 at 36), cites *Schneider v. New Jersey*, 308 U.S. 147 (1939), for the proposition that "one is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place."  *Id*. at 163.  *Schneider*, however, involved a traditional public forum – city streets.  *Id*. at 162.  It thus does not trump the Supreme Court cases cited in text that make the availability of alternative channels of communication a circumstance weighing in favor of the reasonableness of a restriction on speech in a limited public forum.

the government violates the First Amendment when it denies access to a speaker solely to suppress the point of view he espouses on an otherwise includible subject." *Id*. at 806.  Thus, for example, when the subject matter of "child rearing and family values" had not been "placed off limits to any and all speakers," denial of permission to speak on these issues because "the presentation would have been from a religious perspective" constituted viewpoint discrimination.  *Lamb's Chapel v. Center Moriches Union Free School District*, 508 U.S. 384, 393 (1993).

### i.  Speech within the Perimeter.

As discussed in Part I.A.2.a, the University's formal policy excludes all student expressive activity from the Perimeter.  It therefore eliminates the possibility of viewpoint discrimination, since all viewpoints are banned.  *See Bloedorn*, 631 F.3d at 1235 ("There is no record evidence suggesting … that the ban on outside, non-sponsored speakers in these areas is viewpoint-based; it applies equally to all outside, non-sponsored speakers.").  The plaintiff's arguments regarding viewpoint discrimination, however, extend beyond the written policy to the University's historical practice of allowing some student speech in the Perimeter.[32]

---

[32] Without argument or authority, the plaintiff posits that the Second Policy is viewpoint-biased because it does not apply to speech by the University, leaving the University free to express whatever viewpoints it likes.  (Doc. 101 at 28).  As noted in Part I.A.2.b.i, "[t]he Free Speech Clause … does not regulate government speech." *Summum*, 555 U.S. at 467.  "A government entity … is entitled to say what it wishes … and to select the views that it wants to express." *Id*. at 467-68 (internal quotes omitted).  "It is the very business of government to favor and disfavor points of view," and "it is not easy to imagine how government could function if it lacked this freedom." *Id*. at 468 (internal quotes omitted).  The Second Policy cannot be viewpoint-biased in any constitutionally meaningful sense simply because it preserves the University's legal right to express its viewpoint in the Perimeter while denying students and others permission to express theirs.

The plaintiff also argues that the asserted "lack of fit" between the University's desired end (a public perception of its neutrality) and its means (closing the Perimeter to student speech but leaving the campus border open to student speech west of Stadium

As discussed in Part I.A.2.b, the plaintiff has evidence that, over the past five years, the University:  has, on three occasions, allowed an organization of engineering students to promote itself and recruit new members; has allowed a student organization to participate in a one-time commemoration of the 9-11 victims; and has allowed a student group's yard signs for an anti-cancer fundraiser to remain in place for over two months.  The plaintiff draws from this history that the University retains discretion to co-sponsor expressive events with students and student groups and to grant exceptions to the no-speech policy nominally governing the Perimeter.  The plaintiff asserts both that this practice has resulted in viewpoint discrimination in the past and that the lack of adequate standards controlling the discretion to allow student speech in the Perimeter creates an impermissible risk of viewpoint discrimination in the future.  (Doc. 101 at 22, 28-30; Doc. 106 at 22-23).[33]

As to its first argument, the plaintiff has not addressed how closely related the permitted speech and the prohibited speech must be before a case can be made for historical viewpoint discrimination.  The Court therefore is unprepared to rule that, for example, allowing student speech opposing cancer while prohibiting student speech opposing abortion amounts to viewpoint discrimination under applicable law.

As to the plaintiff's second argument, regimes that leave the decision on who may speak to the "unbridled discretion of a government official" are

Drive) supports an inference that the University is acting to suppress particular viewpoints.  (Doc. 106 at 32-33).  A "lack of fit" argument might make sense if the University were excluding certain kinds of speech while permitting other kinds of speech containing the same objectionable characteristic – which is what the plaintiff's cited authorities involved.  But the asserted disconnect here concerns the location of speech, not the content of speech, so it cannot suggest a motive of squelching some viewpoints in favor of others.

[33] The Court has already rejected the defendants' suggestions that, as to all but the Relay for Life episode, there was no expressive activity and that, to the extent there was, it was exclusively the University's expressive activity.  *See* Parts I.A.2.b.vii-viii, *supra*.

"unconstitutional, because without standards governing the exercise of discretion, a government official may decide who may speak and who may not based upon the content of the speech or viewpoint of the speaker." *City of Lakewood v. Plain Dealer Publishing Co.*, 486 U.S. 750, 763-64 (1988). "To avoid unbridled discretion, the permit requirements should contain narrowly drawn, reasonable and definite standards to guide the official's decision." *Bloedorn*, 631 F.3d at 1236. "The [unbridled discretion] doctrine requires that the limits the [defendant] claims are implicit in its law be made explicit by textual incorporation, binding judicial or administrative construction, or well-established practice." *City of Lakewood*, 486 U.S. at 770.[34]

The defendants argue that the "unbridled discretion" principle obtains only in the context of traditional and designated public fora. (Doc. 111 at 12). They overlook *Sentinel*, which applied the doctrine in the context of a limited public forum. 936 F.2d at 1197-1200, 1204; *see also Children First Foundation, Inc. v. Fiala*, 790 F.3d 328, 343-44 (2nd Cir.) ("We thus join our sister circuits that have, over time, been coalescing around the conclusion that the unbridled discretion doctrine applies in the context of nonpublic forums.") (citing *Sentinel* and cases from the Fourth, Seventh, Ninth and Federal Circuits), *vacated on other grounds*, 611 Fed. Appx. 741 (2nd Cir. 2015). The Court accordingly concludes that the doctrine applies to the limited public forum of the Perimeter.

The plaintiff states that the defendants "have unlimited discretion to set aside the Perimeter speech ban by co-sponsoring an event or for speech related to events they deem 'non-expressive,'" as well as by "simply declar[ing] that there are extenuating circumstances." (Doc. 101 at 30; Doc. 106 at 23; Doc. 110 at 13). The evidence of the defendants' historical departures from the no-speech policy tends to support the proposition that they have discretion to make such exceptions

---

[34] A "well-established practice" is indicated, at least, when the government has "specifically drawn reasonable and definite standards … and applied those standards consistently." *Bloedorn*, 631 F.3d at 1237.

39

to the policy.[35]  However, because the plaintiff fails to cite any evidence to support the proposition that this apparent discretion is not governed by standards of the kind described in *City of Lakewood* and elsewhere, it has not met its initial burden on motion for summary judgment.

For their part, the defendants fail to identify any evidence showing that their discretion to allow exceptions to the no-speech policy is subject to the limitations required by law as a guard against viewpoint discrimination.  Instead, they say that their historical exceptions were based only on the identity of the speaker, not the speaker's viewpoint, and that the plaintiff has "no evidence that the Second Policy's application would vary based on a student group's viewpoint."  (Doc. 111 at 12).  As a threshold matter, the defendants cite no evidence to show that they relied on speaker identity to the exclusion of speaker viewpoint.  The thrust of the unbridled discretion doctrine, moreover, is that such discretion of itself raises an unacceptable risk of viewpoint discrimination; there is no burden on the plaintiff to prove that the government has exercised, or will exercise, its unbridled discretion in a viewpoint-biased manner.[36]

---

[35] The defendants do not deny that the potential for viewpoint discrimination which the unbridled discretion doctrine addresses may be established by departures from a viewpoint-neutral formal policy.  *See CAMP*, 451 F.3d at 1280 ("[T]he government exemption [from its festivals ordinance, which exemption applied to co-sponsored events] leaves unbridled discretion in the hands of the city to determine which speech and speakers … to endorse or suppress."); *Bloedorn*, 631 F.3d at 1235 (policy was viewpoint neutral when it applied to all outside, non-sponsored speakers and there was no "record evidence even remotely suggesting that the University has ever made any exception to this policy").

[36] *Forsyth County*, 505 U.S. at 133 n.10 ("[T]he success of a facial challenge on the grounds that an ordinance delegates overly broad discretion to the decisionmaker rests not on whether the administrator has exercised his discretion in a content-based manner, but whether there is anything in the ordinance preventing him from doing so."); *City of Lakewood*, 486 U.S. at 770 (the presumption that the decisionmaker "will act in good faith and adhere to standards absent from the ordinance's face … is the very presumption that the doctrine forbidding unbridled discretion disallows").

### ii. Boundary of the Perimeter.

The plaintiff also invokes the unbridled-discretion doctrine with respect to the inner boundary of the Perimeter.  (Doc. 101 at 30-31; Doc. 106 at 23-24).  The Second Policy defines the outer boundary of the Perimeter as the edge of the public sidewalks, and it defines the side boundaries as the portal of North Drive and the portal of Stadium Drive.  These are clear boundaries, and the plaintiff does not object to them.  The inner boundary, however, is defined as "the street side of University buildings and facilities on the periphery of campus."  (Doc. 29-10 at 3). It is uncontroverted that the terms "facilities" and "periphery" are not defined, that no map or diagram depicts the inner boundary, and that no signs physically mark it.  (Doc. 101 at 30; Doc. 104-1 at 165, 169).  It is also uncontroverted that buildings and other structures, parking lots and other paved areas, fields and other grassy or wooded areas are found throughout the campus and at greatly differing distances from the public sidewalks.  (Doc. 102-6).

"Even if a particular restriction or condition is an otherwise permissible content-neutral regulation of the time, place, or manner of speech, it is unconstitutional if a government official has unbridled discretion to apply it." *Bourgeois v. Peters*, 387 F.3d 1303, 1317 (11th Cir. 2004); *accord Bloedorn*, 631 F.3d at 1236; *Burk v. Augusta-Richmond County*, 365 F.3d 1247, 1256 (11th Cir. 2004).  Thus, for example, "University officials may not exercise unbridled discretion in determining the location of an outside, non-sponsored speaker's expressive activity."  *Bloedorn*, 631 F.3d at 1237.  The Second Policy's identification of the Perimeter's inner boundary is a regulation of the place where student speech may permissibly occur, since speech is forbidden inside that boundary and permitted outside it.  Except as addressed in Part I.A.3.b.i, *supra*, the defendants do not deny that the unbridled-discretion doctrine applies to the

boundary issue, (Doc. 107 at 21-23; Doc. 111 at 12),[37] and the Court concludes that it does apply.

As the plaintiffs acknowledge by silence, what constitutes a "building" is clear enough; what constitutes a "facility," however, is murky.  At one point along University Boulevard, the closest structure to the public sidewalk is a replica of the Tholos of Delphi, an open-air Greek ruin.  Is it a "facility" for purposes of the Second Policy and thus beyond the Perimeter?  Waldrop and Smith say it is, while Mitchell says it is not.  (Doc. 103-23 at 2; Doc. 104-2 at 35-37; Doc. 104-4 at 75-76).  And what of parking lots?  In as many as nine places, the man-made object closest to the public sidewalk is a parking lot.  (Doc. 106-2).  Are these lots "facilities," outside the no-speech zone of the Perimeter?  Waldrop and Smith say they are, but Mitchell says (with considerable internal inconsistency) that they are within the Perimeter even though he considers them to be facilities; moreover, the University's campus map, which identifies "facilities," does not identify parking lots as facilities.  (Doc. 102-6; Doc. 104-1 at 186-87; Doc. 104-2 at 23; Doc. 104-4 at 68-69).  In yet another area, the nearest man-made object to the public sidewalk is the Baptist Student Center ("BSC"), which is not University property.  Does the Perimeter stop at the BSC (because it is a "building") or continue past it into the interior of campus (because it is not a "University building")?  Mitchell has no idea.  (Doc. 104-1 at 161).

As one might expect, there are gaps between buildings and facilities fronting Old Shell Road and University Boulevard (which are wider if parking lots are not facilities).  Where is the inner boundary of the Perimeter in these gaps?  Does it extend as far into the interior of campus as necessary to reach the first building or facility on a line perpendicular to the public sidewalk (which can be several hundred yards from the sidewalk)?  Is it a diagonal line from the street-side corner of one building or facility on the undefined "periphery of campus" to the

---

[37] Most of the defendants' discussion of the boundary issue is presented as a response to the plaintiffs' vagueness challenge under the Due Process Clause.

next?  Is there no Perimeter at all in these gaps (on the theory that, in these spaces, there is no building or facility "on the periphery of campus")?  And how to treat the roads that enter the campus from Old Shell Road and University Boulevard?  Does the Perimeter bisect them or stop at their edge? And if it bisects the roads, where does it do so?

The problem here is not just that the University officials charged with understanding and enforcing the Second Policy don't know what it means; the more serious concern is that, by the uncontroverted evidence, there is no authoritative source to which they can turn to resolve such questions – they have only the ambiguous language of the Second Policy and however they choose to interpret it.  (Doc. 104-1 at 129, 155, 165, 169).  What that means is that the officials' discretion as to where to mark the boundary of the Perimeter – and thus the boundary of where student speech may and may not occur – is not subject to narrowly drawn, reasonable and definite standards.

The defendants, (Doc. 107 at 21), counter that "perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity."  *Ward v. Rock Against Racism*, 491 U.S. 781, 794 (1989).  No doubt, but this case involves not the unavoidable, irreducible minimum of imprecision inherent in language itself but yawning caverns of confusion left by careless employment of this most exquisite means of human communication.  Rules with similarly loose language have been held to leave officials with unconstitutionally broad discretion.[38] So then also does the Second Policy.

---

[38] *See, e.g., Burk*, 365 F.3d at 1256 (where ordinance required an indemnification agreement "in a form satisfactory to" the city attorney but "g[ave] no guidance regarding what should be considered 'satisfactory,'" the requirement was "standardless" and thus unconstitutional); *United States v. Frandsen*, 212 F.3d 1231, 1240 (11th Cir. 2000) (where regulation required official to issue a permit "without unreasonable delay" but did not "provide … any guidance as to what is considered 'unreasonable,'" the regulation was unconstitutional "because it fails adequately to confine the time within which the decision maker must act").

The defendants correctly note that the Second Policy is unambiguous as to the inner boundary of the Perimeter at the corner of Old Shell and University: it is the façade of Shelby Hall. (Doc. 107 at 22). The plaintiff does not disagree. (Doc. 110 at 13-14). But the plaintiff does dispute the defendants' assertion, (Doc. 107 at 22), that this is the only area relevant to its' viewpoint discrimination challenge. "Recognizing the explicit protection accorded speech and the press in the text of the First Amendment, our cases have long held that when a licensing statute allegedly vests unbridled discretion in a government official over whether to permit or deny expressive activity, one who is subject to the law may challenge it facially without the necessity of first applying for, and being denied, a license." *City of Lakewood*, 486 U.S. at 755. Because the plaintiff challenges the defendants' unbridled discretion to define the inner boundary of the Perimeter – a boundary to which the plaintiff is subject – it is immaterial that the plaintiff has never sought permission to engage in expressive activity in the Perimeter's grey areas.[39]

Finally, the defendants repeat their complaint that the plaintiff lacks evidence they ever have construed, or ever would construe, the Perimeter's inner boundary differently depending on the speaker or the speaker's viewpoint. (Doc. 107 at 22). As discussed in Part I.A.3.b.i, this is not a relevant consideration.

Although the Second Policy improperly invests the defendants with unbridled discretion to define the inner boundary of the Perimeter, it does not do

---

[39] Assuming for present purposes that it is incumbent on the plaintiff to show that it desires to speak in areas that may or may not be within the Perimeter depending on how its inner boundary is defined, it has done so. The defendants, (Doc. 107 at 22), have directed the Court to the declaration of the plaintiff's co-president, who states that the plaintiff desires to speak, *inter alia*, between University Boulevard and the Visual Arts Building and the Instructional Laboratory Building. (Doc. 44-1 at 3-4). The Visual Arts Complex is separated from University Boulevard by a parking lot, and there is a gap between the Visual Arts Complex and the Instructional Laboratory Building. (Doc. 102-6). As discussed in text, whether a parking lot is a facility (and thus outside the Perimeter), and whether and to what extent a gap between buildings is within the Perimeter, is subject to the unbridled discretion of University officials.

so throughout the entire length of the Perimeter.  As noted, the Second Policy is perfectly clear that the Perimeter ends when it reaches the façade of a campus building, and the plaintiff asserts no ambiguity in the meaning of "building." Likewise, the Second Policy clearly terminates the Perimeter when it reaches the edge of a "facility," and while it is unclear whether a parking lot or the Tholos of Delphi is a facility, it is uncontroverted under the plaintiff's own evidence that athletic fields and the marching band's practice field are facilities for purposes of the Second Policy.  (Doc. 102-6; Doc. 104-1 at 165; Doc. 104-2 at 23; Doc. 104-3 at 78).  The plaintiff makes no argument to the contrary.  Accordingly, the plaintiff is entitled to summary judgment only with respect to certain areas.  The Court identifies the following as the areas as to which the Second Policy does *not* delegate unbridled discretion and as to which the plaintiff is *not* entitled to summary judgment.

From the public sidewalk paralleling Old Shell Road, north to:

- the south edge of the parking lot south of Stanky Field, the soccer fields, and the softball/soccer fieldhouse (85, 79 and 104, respectively, on the campus map (Doc. 102-6));

- the south edge of the softball field and marching band drill field (101 and 62, respectively, on the campus map);

- the south edge of the parking lot east of the drill field;

- the north edge of the small natural area east of the parking lot and west of Mitchell Center Drive;

- the south edge of the parking lot east of Mitchell Center Drive;

- the south edge of the BSC property (6 on the campus map);

- the south edge of the psychology clinic and associated parking lot east of the BSC property (76 on the campus  map);

- the south edge of the parking lot east of Jaguar Drive;

- the south edge of the structure (electrical substation?) east of the parking lot and west of Shelby Hall; and

- the south edge of Shelby Hall (106 on the campus map).

From the public sidewalk paralleling University Boulevard, west to:

- the east edge of Shelby Hall;

- the east edge of the parking lot north of Shelby Hall;

- the east edge of Laidlaw Performing Arts Center (73 on the campus map);

- the triangles north and south of USA South Drive bordered by South Drive, University Boulevard, and the access lanes to and from South Drive;

- the east edge of the parking lot east of the Tholos of Delphi replica (25 on the campus map);

- the east edge of Administration Court (the semi-circular drive east of the F.P. Whiddon Administration Building (1 on the campus map));

- the east edge of the Instructional Lab Building ("IBL") (including portico) (60 on the campus map);

- the east edge of the parking lot north of the IBL;

- the east edge of Alpha Hall East (2 on the campus map) and the small, unnamed building immediately south of Alpha Hall East;

- the east edge of the Allied Health and Nursing Building ("AHNB") (107 on the campus map) and the parking  lot or other paved area immediately south of AHNB; and

- the triangle south of USA North Drive bordered by North Drive, University Boulevard an access lane from North Drive.

**B.  Due Process.**

The plaintiff's only surviving due process challenge is that the Second Policy is impermissibly vague with respect to the inner boundary of the Perimeter. (Doc. 29 at 33; Doc. 49 at 26-27, 29; Doc. 55 at 11 n.4).

The defendants note that a vagueness challenge is available only when the plaintiff "alleges a constitutional harm." *Indigo Room, Inc. v. City of Fort Myers*, 710 F.3d 1294, 1301 (11th Cir. 2013) (internal quotes omitted).  The plaintiff must either have been prosecuted for violating the challenged rule or have been "chilled from engaging in constitutionally protected activity." *Id.* (internal quotes omitted).  The plaintiff has not been prosecuted, and the defendants assert the plaintiff "has not been deprived of [its] constitutionally protected free speech interest."  (Doc. 98 at 27).  In light of the discussion in Part I.A.3.b.ii, that is a difficult proposition to defend, but it not the relevant proposition to begin with; the question is whether the plaintiff's exercise of its First Amendment rights has been "chilled" by the allegedly vague policy.  Plainly it has.  The plaintiff's co-president declares that the plaintiff has desired to engage in speech between University Boulevard and the Visual Arts Complex and the Instructional Lab Building but that, due to the Second Policy and its provision for sanctioning violators,[40] it has refrained from doing so.  (Doc. 44-1 at 3-4).[41]  Speech is chilled when one refrains from speaking rather than risk prosecution.  *Indigo Room*, 710 F.3d at 1301.

"If one of the two constitutional harms delineated above is implicated, the court looks to whether the ordinance forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its

---

[40] (Doc. 29-10 at 8 ("Students and student organizations operating in violation of these regulations will be subject to disciplinary action under the Student Code of Conduct.")).

[41] As explained in note 39, *supra*, these are areas that may or may not be within the Perimeter, depending on how the Second Policy is construed.

meaning and differ as to its application." *Indigo Room*, 710 F.3d at 1301 (internal quotes omitted).  It would seem obvious from the discussion in Part I.A.3.b.ii that the Second Policy requires persons of common intelligence to guess at the location of the Perimeter's inner boundary at many points:  Does a "facility" include a parking lot?  Where must a building or facility be to be "on the periphery of campus"?  Where is the edge of the Perimeter when there is no building or facility "on the periphery"?  Where is the edge of the Perimeter in between buildings and facilities on the periphery?  Is there even a Perimeter at all in such gaps?

The defendants repeat their reminder that "perfect clarity" is not required, (Doc. 107 at 22), to which the Court repeats its observation:  true but non-responsive.  There is not merely some theoretical, epistemological uncertainty about the inner boundary of the Perimeter that linguistics experts might debate but not ordinary humans; there is instead a congeries of real-world ambiguities, with real-world consequences for guessing wrong.  The defendants also ignore what the plaintiff, (Doc. 106 at 27), pointed out:  "The degree of vagueness that the Constitution tolerates … depends in part on the nature of the enactment," and "perhaps the most important factor affecting the clarity that the Constitution demands of a law is whether it threatens to inhibit the exercise of constitutionally protected rights."  *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 499 (1982).  "If, for example, the law interferes with the right of free speech or of association, a more stringent vagueness test should apply."  *Id*.  The defendants' proposal to apply a deferential standard in a free speech context runs contrary to this directive.

The defendants next suggest that "'the language of the ordinance itself must be vague.'"  (Doc. 98 at 27 (quoting *Diversified Numismatics, Inc. v. City of Orlando*, 949 F.2d 382, 387 (11th Cir. 1991)).  To the uncertain extent the defendants mean to suggest the Court cannot look beyond the four corners of the Second Policy in assessing its vagueness or clarity, the Court rejects the suggestion.  Language is neither used nor applied in a vacuum, so a court must

certainly consider to some extent the context – here including at least the physical features of the campus, which the Second Policy attempts to carve into Perimeter and non-Perimeter by using terms labeling those features and their location.[42]

Nor does *Diversified Numismatics* support the defendants' position. When the Eleventh Circuit stated that the language of the ordinance "itself" must be vague, it was not rejecting all consideration of context but only the plaintiff's suggestion that discriminatory enforcement of the ordinance necessarily reflected its vagueness. 949 F.2d at 387. The panel could hardly have meant that context must be ignored, since it cited *Mid-Fla Coin Exchange, Inc. v. Griffin*, 529 F. Supp. 1006 (M.D. Fla. 1981), as an example of a case "pointing to … specific aspects of the wording of [an] ordinance that are insufficiently definite." 949 F.2d at 387 & n.24. The *Mid-Fla* Court, in turn, relied on information from other sources concerning the various real-world uses of gold, platinum and silver – that is, context – in finding vague a Florida statute regulating the secondhand precious metal industry. 529 F. Supp. at 1028-29.[43]

The plaintiff attacks the Second Policy both facially and as applied. "A facial challenge, as distinguished from an as-applied challenge, seeks to invalidate a statute or regulation itself." *Indigo Room*, 710 F.3d at 1302. The defendants argue the plaintiff cannot maintain a facial challenge. (Doc. 98 at 27-28).

"[F]acial vagueness occurs when a statute is utterly devoid of a standard of conduct so that it simply has no core and cannot be validly applied to any

---

[42] "The applicable standard [of vagueness] is not one of wholly consistent academic definition of abstract terms. It is, rather, the practical criterion of fair notice to those to whom the statute is directed. The particular context is all important." *American Communications Association v. Douds*, 339 U.S. 382, 413 (1950).

[43] As the defendants note, the *Indigo Room* Court quoted the "language of the ordinance itself" portion of *Diversified Numismatics*. 710 F.3d at 1302. But in *Indigo Room*, unlike here, the key terms ("alcoholic beverage establishment" and "bona fide restaurant") were themselves defined by the ordinance, and the plaintiff's argument was the purely hypothetical one – fanciful, given the terms' definitions – that a minor might theoretically enter the former by accident while thinking it was the latter. *Id.*

conduct." *Indigo Room*, 710 F.3d at 1302 (internal quotes omitted). "Conversely, if persons of reasonable intelligence can derive a core meaning from a statute, then the enactment may validly be applied to conduct within that meaning and the possibility of a valid application necessarily precludes facial invalidity." *Id.* (internal quotes omitted). As discussed in Part I.A.3.b.ii, the Second Policy unambiguously establishes the Perimeter's inner boundary in various places – including at the corner of University Boulevard and Old Shell Road (i.e., the eastern and southern façades of Shelby Hall).[44] The plaintiff's only response is the misdirected one that it "desires to speak throughout the Perimeter." (Doc. 106 at 37). The defendants are thus correct that the plaintiff's facial challenge must fail.

The plaintiff is thus confined to an as-applied challenge. The defendants argue the plaintiff cannot pursue such a challenge because its "proposed conduct" – that is, "where it seeks to speak" – is within the unambiguous core of the Perimeter. (Doc. 98 at 28; Doc. 111 at 14). However, and as discussed in note 39, *supra*, the plaintiff has uncontroverted evidence that it wishes to speak in an area that is outside the Perimeter if parking lots are facilities and inside the Perimeter if they are not, as well as in an adjoining area that may be completely or partially outside the Perimeter depending on how gaps between buildings and facilities are treated.

In summary, the plaintiff is entitled to summary judgment on its due process claim to the extent it challenges the vagueness of the Perimeter's inner boundary, except in those areas listed in Part I.A.3.b.ii.

---

[44] The inner boundary is likewise clear in those other locations in the Court's listing as to which its northern or western boundary is identified as a building or field. And while the inner boundary is not clear where, for example, a parking lot is the man-made object closest to the public sidewalk, it is clear that the boundary reaches at least to the southern or eastern end of such parking lots.

### C.  Equal Protection.

The plaintiff's only surviving equal protection challenge is that, under the Second Policy, the defendants permit similarly situated students and student organizations to speak in the Perimeter while denying the plaintiff permission to do so.  (Doc. 29 at 34-37; Doc. 49 at 29).

The critical threshold question is the level of scrutiny to be applied to this claim.  The plaintiff says the difference in treatment "is subject to strict scrutiny as [the Second Policy] infringes on fundamental First Amendment rights."  (Doc. 106 at 37).  The defendant says that rational-basis review applies.  (Doc. 98 at 29).

In *Perry*, the Supreme Court ruled that an interschool mail system was a nonpublic (i.e., limited public) forum, that the differential access provided two unions ("PEA" and "PLEA") was reasonable, and that there was "no indication that the school board intended to discourage one viewpoint and advance another." 460 U.S. at 49-50.  The Court then addressed the plaintiff's equal protection claim:

> As we have explained above, PLEA did not have a First Amendment or other right of access to the interschool mail system. The grant of such access to PEA, therefore, does not burden a fundamental right of the PLEA.  Thus, the decision to grant such privileges to the PEA need not be tested by the strict scrutiny applied when government action impinges upon a fundamental right protected by the Constitution.  …  The school district's policy need only rationally further a legitimate state purpose.

*Perry*, 460 U.S. at 54.  As discussed in Part I.A.2, the Perimeter is a limited public forum.  As discussed in Part I.A.3.a, the restriction on student speech in the Perimeter is reasonable, and as discussed in Part I.A.3.b.i, the plaintiff has failed to show that the differential access afforded the Society of Women Engineers to co-sponsor a cookout and Colleges Against Cancer to place yard signs[45] constituted viewpoint discrimination.

---

[45] These are the only instances of authorized student speech within the Perimeter since adoption of the Second Policy.

But this case differs from *Perry* in one potentially important respect. Unlike in *Perry*, here it remains open to the plaintiff to show that the defendants have unbridled discretion to allow exceptions to the no-speech policy, which discretion would introduce a constitutionally unacceptable risk (though no certainty) of future viewpoint discrimination. *See* Part I.A.3.b.i, *supra*. The parties have not addressed which standard of review obtains under such circumstances, and the Court declines to explore the issue unassisted.

## II. First Policy.

The parties seek summary judgment as to the plaintiff's claim for nominal damages against defendants Steadman and Mitchell in their individual capacities, on the grounds they engaged in viewpoint discrimination in violation of the First Amendment when the plaintiff was denied permission to use what is now the Perimeter for a cemetery of innocents in February 2014.[46]

---

[46] The plaintiff appears to believe this claim is broader than it actually is. First, the plaintiff continues to request declaratory relief, (Doc. 100 at 1), but all claims for declaratory or injunctive relief respecting the First Policy have been dismissed on the grounds of mootness. (Doc. 49 at 3-10, 29).

Second, the plaintiff seeks an award of nominal damages against Steadman and Mitchell, for the same conduct, under the Fourteenth Amendment. (Doc. 100 at 2). That portion of the plaintiff's case, however, has been dismissed due to the plaintiff's failure adequately to respond to the defendants' qualified immunity argument. (Doc. 49 at 26-27, 29).

Finally, the plaintiff argues that this incident also reflects content discrimination. (Doc. 101 at 9, 14-16). That portion of the plaintiff's First Amendment claim has been eliminated due to the plaintiff's failure to show, in opposition to the defendants' qualified immunity argument, that it was clearly established at the relevant time that the perimeter of campus was a traditional or designated public forum. (Doc. 49 at 23-24, 29).

For its part, the defendants appear to believe this claim is narrower than it actually is. They suggest the Court eliminated the plaintiff's First Amendment claim for nominal damages in connection with the October 2013 cemetery of innocents by its ruling on their motion to dismiss. (Doc. 107 at 9 n.16). In fact, the Court granted dismissal of "all claims for nominal damages not based on alleged viewpoint discrimination … in denying permission to use the Perimeter for a cemetery of innocents." (Doc. 49 at 29). There

### A. Steadman.

In early 2014, the plaintiff submitted a request for approval of a cemetery of innocents at the corner of Old Shell Road and University Boulevard ("the Corner"). The plaintiff submitted the request to Steadman, as Dean of the College of Engineering. The defendants argue that Steadman cannot be liable for viewpoint discrimination because: (1) he did not deny the request; (2) he did not deny the request based on viewpoint discrimination; and (3) he did not have authority to deny the request. (Doc. 107 at 9-12).

There is evidence that Steadman denied the request. First, the request contains the handwritten notation, "NO per Dr. Steadman 2/3/14." (Doc. 102-13 at 1). Second, the plaintiff's co-president was told by Steadman's administrative assistant that Steadman "has indicated that location is not available." (Doc. 102-14 at 2). Third, when the plaintiff's co-president asked why Steadman had "denied the request," (*id*.), he did not deny having denied the request but instead said, "[a]s you know, your organization advocates for a position that involves political and social controversy." (*Id*. at 1).[47]

---

were two such incidents, including the one in October 2013. (Doc. 29 at 15). The defendants note the opinion's reference to clearly established law in February 2014, (Doc. 49 at 26), but the Court used that date only because the plaintiff's brief focused on that incident. (Doc. 41 at 33). The law regarding viewpoint discrimination was clearly established long before October 2013, so neither the plaintiff's focus on February 2014 nor the Court's mention of that date worked a dismissal as to the earlier incident. Since neither side has moved for summary judgment as to the October 2013 episode, the Court does not discuss it further, other than as it impacts the claim concerning the February 2014 incident.

[47] The defendants, (Doc. 107 at 9), say that Steadman could not have denied permission to use the Corner, because in the same message he "suggest[ed] that [the plaintiff] contact [Mitchell] regarding any appropriate space for this activity." (Doc. 102-14 at 1). But there is nothing inherently inconsistent between denying permission to use one location and suggesting that Mitchell might approve a different, appropriate location.

There is also evidence that Steadman denied the request based on viewpoint discrimination.[48]  First, and as just noted, when Steadman was asked why he had denied the plaintiff's request, he responded by pointing out that the plaintiff "advocates for a position that involves political and social controversy."  (Doc. 102-14 at 1).  By focusing on the plaintiff's "position" (anti-abortion) rather than on the subject matter (abortion), Steadman's response raises an inference that he considered the plaintiff's viewpoint regarding abortion in denying permission.[49]  Second, in addressing a similar request in late 2013, Steadman stated that the Speech Zone would be a more appropriate location "because of the controversial nature of the organization."  (Doc. 102-11 at 1).  By focusing on the controversial nature of the plaintiff rather than on the controversial nature of abortion, Steadman's response again supports an inference that he considered the plaintiff's viewpoint regarding abortion.  *Cf. Child Evangelism Fellowship, Inc. v. Stafford Township School District*, 386 F.3d 514, 527 (3rd Cir. 2014) ("To exclude a group simply because it is controversial or divisive is viewpoint discrimination.").[50]

_____

[48] As the parties agree, (Doc. 106 at 15; Doc. 111 at 2-3), viewpoint discrimination exists when "the motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction."  *Rosenberger*, 515 U.S. at 829.

[49] Steadman admits the co-president told him the plaintiff was "against abortion." (Doc. 99-7 at 16).

[50] The defendants suggest, with no citation to relevant authority, that a plaintiff cannot prove viewpoint discrimination without showing that the defendant has treated (or at least would treat, if the occasion arose) some other viewpoint more favorably.  (Doc. 98 at 19; Doc. 111 at 4 n.11).  According to *Rosenberger* (with which the defendants agree), the question is whether the speaker's viewpoint was the rationale for restricting the speech.  *See* note 48, *supra*.  Here, Steadman twice verbalized that he relied on the plaintiff's "position" (*i.e.*, viewpoint) and "controversial nature" (*i.e.*, opposition to abortion) as reasons for denying permission to use the Corner.  It is difficult to imagine how a decisionmaker's statement that he refused permission to speak due to the speaker's viewpoint could fail to constitute adequate evidence that he refused permission to speak due to the speaker's viewpoint unless accompanied by evidence that he had allowed, or would allow, some other viewpoint to be expressed.  The implausibility of the defendants' position, and their inability to cite any authority supporting it, persuade the Court to reject it.

Finally, there is evidence that Steadman had authority to deny permission to hold a cemetery of innocents at the Corner.  First, Steadman did not deny having such authority but, under the plaintiff's evidence, proceeded to deny permission. Second, Bolden – the self-described "clearinghouse" for campus speech issues, (Doc. 104:3 at 26) – told the plaintiff's co-president that Steadman had the authority to approve or disapprove requests to use the exterior spaces of Shelby Hall for expressive activity.  (Doc. 99-1 at 32-33).[51]

While there is evidence that Steadman, with authority to do so, denied the plaintiff permission to use the Corner for a cemetery of innocents, and while there is evidence that he did so based on the plaintiff's anti-abortion viewpoint, there is also evidence that would support a contrary finding on each of these points.  Thus, neither side is entitled to summary judgment as to Steadman.[52]

---

[51] The defendants assume rather than demonstrate that Steadman cannot be liable unless he had "authority" to deny permission to use the Corner.  They suggest that lack of actual, formal authority would destroy the necessary causal relation between his conduct and the deprivation of the plaintiff's right to speak, (Doc. 107 at 11-12), but the cases they cite are far too general to demonstrate the correctness of their position.  Surely they do not suggest, for example, that a law enforcement officer's use of unconstitutionally excessive force would not be the cause of the citizen's deprivation of life if policy, or his supervisor, did not authorize him to use such force.

[52] Steadman has already been denied qualified immunity for this claim, since "it was clearly established in February 2014 that such viewpoint discrimination violates the First Amendment."  (Doc. 49 at 25-26).  In a single sentence, Steadman suggests he nevertheless should receive such immunity because existing precedent did not give him fair warning that referring the plaintiff to Mitchell constituted viewpoint discrimination. (Doc. 98 at 19; Doc. 107 at 12).  This argument misunderstands the source of Steadman's liability.  It is not Steadman's suggestion that the plaintiff contact Mitchell that gives rise to liability but his decision (per the plaintiff's evidence) to deny the plaintiff permission to use the Corner because of the plaintiff's anti-abortion viewpoint.  It was certainly clearly established in February 2014 that such viewpoint discrimination is unconstitutional even in a limited public forum.  (Doc. 49 at 25-26).

### B. Mitchell.

The plaintiff does not assert that Mitchell engaged in independent viewpoint discrimination.  Instead, the plaintiff argues that Mitchell is liable because he "affirmed" Steadman's allegedly viewpoint-biased decision.  (Doc. 101 at 19).  The plaintiff offers three theories of how liability attaches.

First, the plaintiff argues that Mitchell "ratified" Steadman's viewpoint discrimination.  (Doc. 101 at 19).  According to the plaintiff's sole authority, ratification requires that the superior had an opportunity to review the subordinate's decision "and agreed with both the decision and the decision's basis."  *Salvato v. Miley*, 790 F.3d 1286, 1296 (11th Cir. 2015) (internal quotes omitted).

Steadman forwarded to Mitchell his explanation of why he denied the plaintiff permission to use the Corner.  Mitchell responded, "[w]e have identified [the Speech Zone] as the appropriate location for any events or displays similar [to] the one mentioned here."  (Doc. 102-16 at 1).  Mitchell did not acknowledge the reasons given by Steadman, much less express approval of them, and the plaintiff does not argue otherwise.  Instead, the plaintiff insists that Mitchell ratified Steadman's allegedly viewpoint-biased reasoning simply by failing to "distance himself" from that reasoning.  (Doc. 101 at 20; Doc. 106 at 17; Doc. 110 at 10).  The plaintiff's sole authority, however, does not articulate or support the proposition that failure to express disagreement with a subordinate's reasons constitutes agreement with those reasons for purposes of ratification.[53]  Without such support, the plaintiff cannot prevail on this theory.

Second, the plaintiff argues that Mitchell is liable under a "subordinate bias" theory.  (Doc. 101 at 20).  Under this theory, Steadman did not make the decision to deny permission to use the Corner but made only a recommendation of

---

[53] In *Salvato*, the superior did not have a timely opportunity to review the subordinate's decision to begin with.  790 F.3d at 1296.

denial (based on viewpoint discrimination), which recommendation Mitchell "adopted." (*Id.*). This theory, according to the plaintiff, spares it the burden of showing that Mitchell realized that Steadman was motivated by viewpoint bias and that Mitchell agreed with that bias. The problem is that, by the plaintiff's sole authority, "subordinate bias" is a means of making the entity (here, the University) liable, not the individual (here, Mitchell) that accepted the tainted recommendation.[54]

After the defendants pointed out this flaw, (Doc. 107 at 13), the plaintiff in reply cited several trial court cases for the proposition that "subordinate bias" (or "cat's paw") theory also supports "individual *subordinate* liability" under Section 1983. (Doc. 110 at 10-11 (emphasis added, internal quotes omitted)). All this means, however, is that a cat's paw superior's acceptance of a subordinate's tainted recommendation does not break the causal chain and thereby preclude the subordinate's liability for his biased recommendation; it does not mean that the superior becomes liable for the subordinate's bias.

Finally, the plaintiff argues that "allegations of facts that demonstrate an immediate supervisor knew about the subordinate violating another's federal constitutional right to free speech, and acquiescence in that violation, suffice to state free speech violations under the First … Amendmen[t]." *OSU Student Alliance v. Ray*, 699 F.3d 1053, 1075 (9th Cir. 2012).[55] Assuming without deciding that this is a sound principle, it was announced by the Ninth Circuit, and the plaintiff has offered no case from the Supreme Court or the Eleventh Circuit echoing or adopting it. Thus, and as the defendants argue, (Doc. 111 at 6), for purposes of qualified immunity analysis the plaintiff has not met its burden of showing it is "clearly established" that a supervisor violates a plaintiff's First

---

[54] *Staub v. Proctor Hospital*, 562 U.S. 411, 422 (2011).

[55] Acquiescence in this context apparently means "d[oing] nothing." *Id.*

Amendment rights when he knows of a subordinate's violation and does nothing. (Doc. 49 at 19).[56]

## CONCLUSION

For the reasons set forth above, the plaintiff's motion for summary judgment as to viewpoint discrimination under the First Amendment and vagueness under the Due Process Clause is **granted in part**.  The Second Policy violates the plaintiff's constitutional rights under these provisions to the extent it purports to establish, or permits officials to establish, an inner boundary of the Perimeter other than as listed in Part I.A.3.b.ii.  In all other respects, the plaintiff's motion for summary judgment is **denied**.

For the reasons set forth above, the defendants' motion for summary judgment as to viewpoint discrimination under the First Amendment and vagueness under the Due Process Clause is **granted in part**.  The Second Policy does not violate the plaintiff's constitutional rights under these provisions to the extent it purports to establish an inner boundary of the Perimeter as listed in Part I.A.3.b.ii.  The defendants' motion for summary judgment as to the claim against Mitchell for nominal damages is **granted**.  The defendants' motion for summary judgment as to the type of forum the Perimeter represents (limited public forum) is **granted**, as is the defendants' motion for summary judgment as to the reasonableness of the restrictions on speech in the Perimeter.[57]  In all other respects, the defendants' motion for summary judgment is **denied**.

The parties are **ordered** to confer regarding the wording of a judgment awarding declaratory and injunctive relief in accordance with this order and to file

---

[56] The plaintiff has likewise failed to show it is clearly established by Supreme Court or Eleventh Circuit precedent that a superior's liability for a subordinate's First Amendment violation can be established under a cat's paw theory.

[57] The Court makes these rulings pursuant to Fed. R. Civ. P. 56(g).

a proposed judgment (or, in the case of good-faith disagreement, separate

proposed judgments), on or before **March 7, 2016**.

DONE and ORDERED this 22nd day of February, 2016.

s/ WILLIAM H. STEELE
CHIEF UNITED STATES DISTRICT JUDGE